**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Norman Phillip CONNER and Samuel Nolan Mann, Defendants-Appellants.**

**No. 72–1094.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1972.

Decided May 23, 1973.

---

Max Cohen, Gary, Ind., for defendants-appellants.

William C. Lee, U. S. Atty., John R. Wilks, Asst. U. S. Atty., Fort Wayne, Ind., for plaintiff-appellee.

Before FAIRCHILD, PELL, and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

A two-count indictment charged Norman Conner and Samuel Mann with violation of 18 U.S.C. §§ 2312 and 2313. A jury found the defendants not guilty on the first count but guilty of the section 2313 charge, receiving and concealing a stolen Chevrolet automobile which was moving as interstate commerce knowing the car to have been stolen. Conner was sentenced to four years' imprisonment, Mann to five.

The primary issue raised by the defendants on this appeal is whether the district court erred in denying their pre-trial motion to suppress and reject all evidence obtained by Hammond, Indiana, police officers as a result of an allegedly unconstitutional search and seizure.

### I

In late January or early February 1971, an officer of the Hammond Police Department received a tip from an Illinois policeman that a certain garage in Hammond was being used by auto thieves as a "cut shop" (a place where stolen automobiles are taken apart). On February 5, 1971, the Hammond police began surveillance of the garage. It was a concrete block building fronting on a sidewalk and with a public alley running along and adjacent to one side. A sign on the front of the building said "D & L Auto Repair" along with some other wording about the business. On the front or streetside was an overhead door to allow the passage of vehicles; next to this door was a smaller door. Both these doors were locked whenever the policemen examined the premises. In the rear wall of the garage was another overhead door, 12 feet by 12 feet. An unfenced concrete apron provided access to the alley.

The policeman who watched the garage on February 5 looked through a window and saw two motor vehicles, one of which was a green Buick Riviera with a dark green vinyl top. When this car was again observed several days later, its description was given to the head of the stolen automobile detail, who determined that a car matching that description had recently been reported stolen. The police then requested a resident of the neighborhood to call them if he saw anyone in the garage. On the afternoon of February 11, the neighbor informed the police that two men were in the garage.

When two officers approached the building, they heard pounding on metal, the sound of power tools, and other noises coming from inside the garage. After a third policeman joined the two already at the garage, the officers split up. One covered the front while the other men proceeded down the public alley to the rear of the building, where they found the overhead door open. From either the alley or the adjoining unfenced apron, they were able to observe the well-lighted interior of the garage. Inside were two cars, the green Buick Riviera and a Chevrolet. Defendant Conner was removing the trunk lid from the Chevrolet; the car's hood, doors, and hub caps had been removed

and were on the floor. Tools were strewn about. An open attaché case was on the hood of the Riviera. As the officers approached the door, they met defendant Mann coming out with a garbage can.

The two officers came part way into the garage and then summoned the policeman who had been watching the front. The officers then asked the defendants if they had a log book as required by Indiana law, Burns' Ind.Ann. Stat. § 47–552, IC 1971, 9–9–5–6. When the defendants answered in the negative, they were arrested.

The policemen proceeded to search the garage. They examined the parts of the Chevrolet that had been removed and determined that, prior to disassembly, the car had sustained no damage that would have required repair work. The trunk lock of the Riviera had been punched. Two Illinois license plates, a lock puller, a key maker, a key code, and several other articles were lying in the open attaché case on the Riviera's hood. Looking through the windshields of the automobiles, the officers read the vehicle identification numbers. A subsequent check revealed that both cars had been stolen.

Following a hearing on the defendants' motion to suppress, the district court held that the police officers' observation of the interior of the garage from outside prior to entry did not constitute a "search" within the meaning of the Fourth Amendment. It also found that the officers' subsequent warrantless search of the interior was based on probable cause and was justified by "exigent circumstances." [1]

On this appeal, we are required to accept the district court's findings unless they are clearly erroneous.

United States v. Ganter, 436 F.2d 364, 368 (7th Cir. 1970). We also note that "[c]redibility of witnesses on a motion to exclude or suppress evidence is for the district judge to determine." United States v. Hilbrich, 341 F.2d 555, 559 (7th Cir. 1965), cert. denied, 381 U.S. 941, 85 S.Ct. 1775, 14 L.Ed.2d 704.

We agree with the district court that, until the officers saw the automobile being disassembled, it was reasonable for them to conclude that they lacked sufficient grounds for the issuance of a search warrant. Nor can we fault the police for having continued their surveillance. We also agree that their viewing from outside the activities inside the building was not a "search" within the meaning of the Fourth Amendment. The officers were at the garage for the valid purpose of verifying a tip about illegal activities and they reached the rear of the building via a public way. Although, as the findings of fact state, "[i]t was uncertain from the evidence whether the police officers were in the alley or on the adjoining apron outside the rear door of the garage when they first saw the activities being conducted inside, . . . the interior of the garage was clearly visible through the open overhead door from outside the building." Under these circumstances, the defendants had no reasonable expectation of privacy. Even if the officers were on the apron, which was not fenced off from the alley, we think that a mere "technical trespass" did not transform an otherwise reasonable investigation into an unreasonable search. See United States v. Hanahan, 442 F.2d 649, 653–654 (7th Cir. 1971).

Once the officers observed the suspicious activity in the garage and the dismantled condition of the Chevrolet,

1. In a prior memorandum denying the defendants' motion to suppress, the trial judge had based his decision on the ground that the defendants had failed to establish standing to maintain the motion. The parties had stipulated to the existence of standing and thus had limited the evidence presented on the issue. When the defendants subsequently offered affidavits to establish their standing, the additional materials apparently stilled the doubts the court had had initially. Cf. Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); United States v. Mahanna, 461 F.2d 1110, 1117 (8th Cir. 1972).

they had probable cause to believe that they were witnessing criminal acts. Further, the police were then justified in making a warrantless entry into the garage to arrest Conner and Mann. As the district court stated, "it would have been wholly unreasonable to stand idle, watching further damage being done to cars which were almost certainly stolen, while a warrant was obtained. As police officers, they had a duty to preserve and protect the property of the owners, and . . . exigent circumstances justified their entry into the garage."

 Also, the officers were entitled to "seize" the Chevrolet, the existence of which they had been ignorant until they saw it in "plain view" through the open garage door. The automobile's identification number was readily observable through the windshield. Finally, the open attaché case with the Illinois license plates and the key and lock equipment was in plain view of the police when they were arresting the defendants and seizing the Chevrolet. *Contrast* Coolidge v. New Hampshire, 403 U.S. 443, 460, 471, 472, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971).

Defendants argue, however, that their arrest eliminated the danger that the items could have been destroyed or removed and that, therefore, no exigent circumstances existed justifying the officers' failure to obtain a search warrant. They rely in part on United States v. Sokolow, 450 F.2d 324 (5th Cir. 1971).

 The factual situation and circumstances of the present case, however, are quite different from those involved in *Sokolow*. There, the arresting officer fortuitously had come to the defendant's garage while following a suspect in connection with the theft of cigarettes, property totally unrelated to the air conditioners which the officer observed stacked in the garage and the seizure pertaining to which the Fifth Circuit held should have been suppressed. There was

no probable cause nor were there exigent circumstances. Likewise, the plain view doctrine was inapplicable in *Sokolow*. Although the arrest in the present case was technically made on the basis of the Indiana log book statute,[2] acts associated with the disposition of stolen property, with all the "tools of the trade" nearby, were being committed in the plain view of the officers. The arrest of the defendants did stop their destructive activity, but the officers had no way of knowing that others might not have been involved who could have completed the process before a warrant could be secured. The officers promptly and properly put an immediate stop to the process being committed in their presence. It is no answer to say that an officer could have been left at the premises while a warrant was being secured as this would merely have meant that each subsequently appearing confederate would have had to be arrested while the warrant was being waited for, a delay that the exigencies of the circumstances did not require.

The circumstances here are also entirely different from the coercive situation found in United States v. Gardner, 467 F.2d 205 (7th Cir. 1972).

## II

The defendants also contend that the trial court erred in denying their motion for judgment of acquittal as to Count II. The defendants had maintained that at the time they were in possession of the Chevrolet it was not in interstate commerce. On appeal, they further argue that the jury's finding of not guilty on Count I, which charged them with transporting a stolen motor vehicle, was inconsistent with its verdict on Count II.

The evidence at trial established that one James Taporski had parked his Chevrolet on a Chicago street on the morning of February 11, 1971. The windows were closed and the doors locked. Shortly after 1 p. m. the same

---

2. In *Sokolow*, the arrest at the garage was of the stolen cigarettes suspect, not of Sokolow. Here, the defendants were arrested.

day, the defendants were discovered, as we recounted above, in a garage in Hammond, Indiana, with this same automobile, which had been partially dismantled. An open attaché case in the garage contained Taporski's Illinois license plates as well as some key and lock equipment.

The garage was owned by Jerry Keilman who rented it by telephone to a man representing himself to be Richard Wilson. Keilman received the rent by mail. An investigation revealed that no Richard Wilson lived at the return address given on the rent envelopes.

In defense, Mann testified that at 10 a. m. on February 11th a man whom he knew as Bill Stone called him and inquired whether he wanted to make some money; Stone needed "body men." Mann then told Conner of the offer. Stone allegedly gave Mann the key to "his" garage and paid the defendants thirty dollars apiece to clean the garage and disassemble a car. Mann claimed that Stone had explained he wanted the car—the Chevrolet referred to in the indictment—disassembled because the person from whom he had bought it had failed to give him the title for it and had skipped town.

Bill Stone did not testify. Mann stated that he had been unable to locate Stone. Keilman testified that he had never rented his garage to a Bill Stone.

Mann's own testimony as to when he and Conner began to work in the garage supports the conclusion that the Chevrolet had been stolen only five or six hours before the defendants were discovered. The garage was a well-equipped cut-shop and had been rented under a fictitious name—suspicious circumstances suggesting that the use of the building was an integral part of a car-theft scheme. Further, it was within the jury's province to disbelieve defendant Mann's testimony about "Bill Stone." And, even if the jury chose to believe that the defendants had been hired by Stone, the jury could validly have found that the defendants' work on the stolen Chevrolet was so intimately bound up with its theft and transportation that the car could be deemed not to have left interstate commerce. As the Sixth Circuit stated in Schwachter v. United States, 237 F.2d 640, 644 (6th Cir. 1956):

"It is recognized that the interstate movement of a car does not necessarily cease when the car stops and transportation of it into the other state ends. The sale thereafter may be an incident to the theft and transportation and so tied up with it as to constitute the final step of a continuous unlawful scheme. . . . It is a question of fact under the surrounding circumstances in each particular case. Being a question of fact it is for the jury to determine."

The defendants rely on Davidson v. United States, 61 F.2d 250 (8th Cir. 1932), where the Eighth Circuit held, *inter alia,* that the indictment was defective because it failed to allege that the stolen automobile was part of interstate commerce when received by the appellants.

Here there is no question but that the indictment is sufficient. Also, the evidence in *Davidson* suggested that the destination of the stolen car had been Kansas City, a destination reached several days before the automobile came into the appellants' possession. This, plus the lack of evidence that the transporters of the stolen vehicle had intended to deliver it to these defendants, persuaded the court that the automobile had lost the character of interstate commerce. Here, in contrast, the Chevrolet could be said to be truly "hot" as its engine had scarcely been allowed a cooling-off period following its migration from Chicago. See United States v. Briddle, 430 F.2d 1335 (8th Cir. 1970). The indicia of its origin and true ownership had not even been completely destroyed.

Thus, we hold that the evidence, viewed in the light most favorable to the Government, was sufficient to support the jury's verdict. That verdict

was not inconsistent with the finding of not guilty on Count I. It is not illogical to doubt that someone caused a stolen motor vehicle to be transported in interstate commerce and yet to be convinced that that same person received and concealed the motor vehicle while it was still in interstate commerce. See United States v. Sutt, 415 F.2d 1305 (7th Cir. 1969).

We therefore affirm the convictions of defendants Mann and Conner.

Affirmed.