UNITED STATES ex rel. William H. GEDKO, Petitioner,

v.

John A. HEER and Elmer O. Cady, Warden of Wisconsin State Reformatory, Respondents.

No. 74–C–301.

United States District Court, W. D. Wisconsin.

Aug. 27, 1975.

R. R. Roggensack, Lancaster, Wis., for petitioner.

William A. Platz, Asst. Atty. Gen. of Wis., Madison, Wis., Bronson C. La Follette, Atty. Gen., for respondents.

OPINION AND ORDER

JAMES E. DOYLE, District Judge.

Petitioner has exhausted his state court remedies within the meaning of 28 U.S.C. § 2254.

I accept and adopt the findings made by the state court and embodied in the "proposed findings of fact" set forth in the report and recommendation of the United States Magistrate.

The directions from the Supreme Court of the United States and the United States Court of Appeals for the Seventh Circuit are indistinct. However, it appears that the clearest directions are to be found in *United States v. Katz*, 389 U.S. 347 (1967) and *United States v. Case*, 435 F.2d 766 (7th Cir. 1970). Upon the basis of these cases, and others, I conclude that the essential question is whether the defendant enjoyed an expectation of privacy with respect to his conversations and activities in the area outside his farm house, and with respect to the conversations and activities with his wife in that area, and whether that expectation was one which society is prepared to recognize as reasonable. I conclude that defendant did enjoy such an expectation and that it was one which society is prepared to recognize as reasonable. Therefore, when the law enforcement officers listened to these conversations and watched these activities from their hiding place well within the boundaries of defendant's farm, they engaged in a search. This search was warrantless, and it was made in the absence of any exigent circumstances known to the officers prior to the time that they heard what they heard and saw what they saw. I accept and adopt the proposed conclusions of law embodied in the report and recommendation of the United States Magistrate. I add the conclusion that had the fruits of the unlawful search been suppressed as evidence in the state trial court, there clearly would have been no conviction.

Upon the basis of the entire record herein, it is hereby ordered that the petition for habeas corpus is granted and that the respondents are ordered to release the petitioner from custody forthwith.

## REPORT AND RECOMMENDATION

This is a petition for a writ of habeas corpus. Petitioner, an inmate of the Grant County, Wisconsin jail, claims he is in custody in violation of the United States Constitution. 28 U.S.C. § 2254.

Petitioner contends that his conviction was secured by the admission of evidence obtained through an unconstitutional search and seizure.

## EXHAUSTION OF STATE COURT REMEDIES

Petitioner alleges that he has exhausted his state court remedies within the meaning of 28 U.S.C. § 2254: his conviction was affirmed by the Supreme Court of the State of Wisconsin on June 4, 1974, and his motion for rehearing was denied by that court on August 1, 1974. Counsel for respondent does not dispute the allegation that petitioner has exhausted his state court remedies.

From a review of the published opinion of the state supreme court, *State v. Gedko*, 63 Wis.2d 644, 218 N.W.2d 249 (1974), it appears that petitioner has raised in state court the precise contention he is raising herein. The court could properly find that petitioner has exhausted his state remedies within the meaning of 28 U.S.C. § 2254.

## PROPOSED FINDINGS OF FACT

Petitioner has filed with the court a copy of the brief and appendix filed in the Supreme Court of the State of Wisconsin in connection with the appeal of his conviction. He alleges that the appendix to the brief contains the state trial court's written opinion and factual findings denying petitioner's pretrial motion to suppress evidence. Petitioner advises the court that he does not contest the presumptive correctness of the trial court's findings of fact.

The state trial court made the following findings of fact—(Brief of and Appendix of Appellants, filed in the Supreme Court for the State of Wisconsin, appendix, pp. 101–106):

1. On August 25, 1972, Perry Ahnen, a deputy sheriff [for Grant County, Wisconsin], who had theretofore received specialized training in the detection and identification of dangerous drugs, was informed by one Marion Rhodes, a deputy sheriff for Dane County, Wisconsin, on assignment with the Madison Metro Narcotics Squad, that he (Rhodes) had received information from a reliable informer that a person known as "Tad," and whose full name was subsequently learned by Rhodes to be William Gedko, was growing, harvesting and selling marijuana on a farm located near the village of Muscoda in Grant County, Wisconsin. Thereafter and prior to August 30, 1972, Officer Ahnen checked the records in the office of the Register of Deeds of Grant County, Wisconsin, and determined therefrom that [petitioner and his wife] were the owners of a 160 acre farm located near Muscoda in said county.

2. On August 30, 1972, at approximately 5:40 o'clock, p. m., Central Daylight Time, Officers Ahnen and Rhodes together with Officer Frank McCoy, a Dane County, Wisconsin deputy sheriff assigned to said Madison, Wisconsin, Metro Narcotics Division, and together with Agent Andrew Kubash of the Wisconsin Department of Justice, parked the car in which they were riding on a public highway near [petitioner's] farm and gained entrance to [petitioner's] farm through an adjoining field. The officers climbed a fence at the boundary of [petitioner's] farm premises and proceeded thereupon to intrude onto [petitioner's] lands through open fields and timber to a point which was approximately 300 to 400 feet west of [petitioner's] farm buildings. The four officers reached this point at approximately 6:10 o'clock, p. m., and during a period of daylight. At that point they positioned themselves at the edge of the timber line and did then proceed to observe [petitioner's] build-

ings for a period of ten to fifteen minutes. A few minutes prior to the time the officers positioned themselves as aforesaid, an airplane flown by a law enforcement officer was flying over and criss-crossing the air space above [petitioner's] farm buildings.

3. No express consent had been given to any of the above-named intruding law officers by either [petitioner or his wife] to enter upon the fields in the manner above set forth on August 30, 1972.

4. As the officers sat in the position last above described, Patricia Gedko [petitioner's wife] was observed to come running out of the house and was heard to shout to her husband, [petitioner] William Gedko, "Tad, do you know who that fucking plane is registered to?" Patricia Gedko then informed her husband that the plane was registered to "the government in Madison, I got the number and called Truax Field, Madison." William Gedko thereupon ran towards a shed located near the house and shouted to his wife, Patricia, "Get that marijuana off the refrigerator, out of the house, and we will put it in the woods." Patricia Gedko re-entered the house and re-emerged from the house carrying a brown paper bag. In the meantime [petitioner] entered the shed and emerged therefrom carrying two burlap bags that appeared to be full of some material and ran into the woods with said bags, returning from the woods without them. Patricia Gedko then shouted, "What are we going to do with the stuff?" And William Gedko then shouted, "We will pile it up and burn it." Patricia Gedko placed the brown bag on the ground near a barrel to the south of the shed and west of the house and the [petitioner] at about the same time came out of the shed with an armful of material which appeared to be plants, stalks and leaves similar to marijuana which he placed on the pile with the brown bag.

5. The officers at that point, having reasonable and probable grounds to believe that marijuana was about to be burned and destroyed by [petitioner and his wife] and under the exigent circumstances then and there existing, ran down the hillside toward [petitioner and his wife] and toward the pile of material which was about to be burned, shooting their guns into the air.

6. The officers then proceeded to search the individuals to see if they were armed and then proceeded to look into the buildings to see if there were any other individuals present but at that time made no further search or observation of the interior of any building.

7. Thereupon Officer Ahnen went into the woods and located the two burlap bags which he had seen carried into the woods by [petitioner] and which, as a result of a positive reaction to a modified Duquenois field test administered by Officer Ahnen, appeared to contain marijuana.

8. The officers also seized the material in the pile near the barrel consisting of the stalks and plant-like material and the contents of the brown bag. Four peyote buttons were found in the brown paper bag, together with a smoking pipe, cigarette papers and scissors.

9. The place where the brown bag and stalks were seized was in an open field and was not part of the [petitioner] curtilage. Said items were not within such proximity to [petitioner] dwelling nor within any general enclosure surrounding the dwelling as to constitute such location as within the curilage [sic].

10. Immediately thereafter Officer Ahnen telephoned a request that the district attorney and a court commissioner come immediately to [petitioner's] premises. These officers thereafter and on the same day appeared at [petitioner's] premises and, with a court reporter present, proceedings were held before the court commissioner for the issuance of a search warrant of the buildings and based on the testimony of Officer Rhodes, which included substantially the facts above stated, a search warrant was then issued by the commissioner and a search was then conducted of [petitioner's] building which resulted in finding

some additional marijuana and one peyote button.

11. Approximately 80 pounds of marijuana and five peyote buttons were seized as a result of the activities of the officers above described, which marijuana has a value on the illicit market of between $10,000 and $14,800.

12. The four officers, prior to the issuance of the search warrant, were at all times in the open field owned by [petitioner and his wife] and were at no time in the buildings owned by [petitioner and his wife] except when they checked the buildings for the purpose of determining if additional individuals were located therein and during which check no searches or seizures were made.

13. All observations made by the officers were made from open fields and all seizures prior to the issuance of the search warrant were made in open fields and not within the curtilage of the [petitioner].

## PROPOSED CONCLUSIONS OF LAW

The fourth amendment proscribes unreasonable searches and seizures, affirming "the right of the people to be secure in their persons, houses, papers, and effects." Certain official observations, interceptions, and seizures, however, are considered by the courts to be completely outside the scope of the fourth amendment's proscriptions. These include observations of objects in "plain view," made by officers from a position in which they have a legal right to be, and observation or interception of matters as to which there is no reasonable expectation of privacy. If a particular investigative activity is not a "search," then the "reasonableness" of the manner in which the investigation was carried out is never at issue.

In this proceeding, the initial question to be determined is whether the activities of the law enforcement officers on petitioner's farm property constituted a search.

It is petitioner's contention that he had a reasonable expectation of privacy as to his conversations and activities outside his farm home; that the observations and eavesdropping by law enforcement officers on his private property constituted a search and seizure within the meaning of the fourth amendment; that it was a search and seizure carried out without the warrant required by the fourth amendment; and that it was therefore illegal. Respondent, on the other hand, contends that the observations and eavesdropping by the officers were all made from the "open fields," to which the protection of the fourth amendment has never extended, citing *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924).

The leading case on the scope on the protection of the fourth amendment is *United States v. Katz*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In that case, the Supreme Court held that the governmental bugging of a caller in a public telephone booth was a search subject to the warrant requirements of the fourth amendment. Katz had argued that the bugging was a search on the theory that a telephone booth may be characterized as a "constitutionally-protected area" within which a person is protected by the fourth amendment as he would be in his own home or office. The Supreme Court rejected that approach, stating that the effort to decide whether a given "area" is to be constitutionally protected is essentially irrelevant.

> "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. 347 at 351–352, 88 S.Ct. at 511.

The opinion has been generally understood to hold that official intrusion into matters or activities as to which an individual has a "reasonable expectation of privacy," are searches within the meaning of the fourth amendment. A reasonable expectation of privacy is something more than a mere subjective expectation of privacy on the part of the person as-

serting the claim. It is an expectation that "society is prepared to recognize as 'reasonable.'" Harlan, J., concurring, *United States v. Katz*, 389 U.S. 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

An examination of the lower court decisions reveals that the determination of the reasonableness of any asserted expectation of privacy turns on the court's evaluation of the particular circumstances surrounding the incident.

In *United States v. Case*, 435 F.2d 766 (7th Cir. 1970), for example, the Court of Appeals upheld the suppression of the fruits of the government's eavesdropping on defendant's counterfeiting operation. In that case, the government agents had used no electronic equipment to overhear the defendants' conversations, but had listened at the doorway to defendants' apartment from a hallway. The district court found as fact that the hallway "was not such a public area as to entitle the court to consider it a non-protected area;" that the hallway was kept locked; that it was used only by the tenants and the proprietor of the building; that defendant Case had changed the locks on one of the doorways; that the defendants sought to keep their conversation private; that the conversation that was overheard indicated that the defendants were concerned about being overheard; and that the defendants did not expect that federal agents would be located just a few feet away from them in the hallway.

In *United States v. Cogswell*, 486 F.2d 823 (7th Cir. 1973), the Court of Appeals found there was no reasonable expectation of privacy on the part of participants in The Woodlawn Organization who were charged with various counts of forgery and making false statements to obtain money from the Office of Educational Opportunity and who were voluntary participants in an educational program subject to continual monitoring by United States Government officials. The activities of the defendants were carried out at training centers which were accessible to anyone having an interest in the program, which were not under the exclusive control of defendants and which also were not so intrinsically associated with the individual as to give rise to a reasonable expectation of privacy. The court also found that any expectation of privacy was negated by the fact that police officers were present at the training centers on numerous occasions and that their presence was well-known to the defendants.

In *United States v. Hanahan*, 442 F.2d 649 (7th Cir. 1971), the Court of Appeals found that the owner of a car who kept his car in a leased garage which had three windows, only one of which was covered, and who kept a lock on the door but loaned out the key to friends and permitted others to enter the garage, had no reasonable expectation of privacy sufficient to warrant the suppression of the observations made by a policeman who stood on a sidewalk near the garage and looked through a service door at defendant's car. The fact that the walk on which the officer stood was on private property was not considered significant in light of the property owner's testimony that he permitted his tenants, his customers, delivery men, garbage men and others to use the walk.

In *United States v. Conner*, 478 F.2d 1320 (7th Cir. 1973), the Court of Appeals found that the defendants had no reasonable expectation of privacy as to their activities within an auto repair building when those activities were visible through the open overhead door to policemen standing out in the alley. The court found it unimportant whether the policemen were actually standing in the alley or on an adjoining apron of land belonging to the garage owner. "Under these circumstances, the defendants had no reasonable expectation of privacy. Even if the officers were on the apron which was not fenced off from the alley, we think that a mere 'technical trespass' did not transform an otherwise reasonable investigation into an unreasonable search." At 1323.

In two leading cases applying *Katz*, the Ninth Circuit also undertook to evaluate all of the circumstances of a partic-

ular government investigation. In *Wattenburg v. United States*, 388 F.2d 853 (9th Cir. 1968), the Ninth Circuit Court of Appeals held that a governmental search of allegedly contraband trees stockpiled in the defendant's backyard, no more than 35 feet from the building, was an unconstitutional intrusion. The court considered it significant that government agents spent almost eight hours, from 2:35 p. m. until 9:00 p. m., in defendant's back yard making matches of stump cuts, using flash lights and making a certain amount of noise, and that the trees were located no more than twenty to thirty-five feet from the main lodge where defendant lived. The court said, "There can be no doubt that Wattenburg, in placing the stockpile this close to his place of residence, sought to protect it from this kind of governmental intrusion." At 858. The court did not apparently place any emphasis on the trial court's findings that the "main lodge" which was defendant's abode, was a motel, and that the stockpile of trees was only five feet from a parking lot used by the employees and patrons of the lodge.

In *United States v. Frisch*, 474 F.2d 1071 (9th Cir. 1973) the Court of Appeals found that no search or seizure had occurred when law enforcement officers overheard conversations in a motel room from their own room next door. The court accepted the lower court's findings in the case that (1) a motel room has a special character of intimacy justifying its characterization as a private place; (2) the information obtained was gathered without a trespass; (3) the law enforcement officers used no artificial aids to overhear the conversations; (4) the offense was a serious one involving the smuggling of contraband; and (5) the degree of probable cause was high.

One other case should be noted. *Patler v. Slayton*, 353 F.Supp. 376 (E.D.Va. 1973), was a petition for a writ of habeas corpus in which petitioner claimed that the state trial court had wrongly refused to suppress certain slugs said to match those in the murder weapon. The slugs in question had been found in an examination of a mowed and open farm pasture located approximately 250 yards from a farm house, on a farm owned by petitioner's father-in-law. The district court concluded that the slugs had been properly admitted into evidence for the reason that the petitioner could not reasonably have expected privacy in the area where the slugs were found. The area was used for picnicking and as a children's play area, as well as for target shooting. The area belonged to petitioner's father-in-law and could not be considered to be within the petitioner's private domain.

It should be pointed out that in affirming the district court, the Court of Appeals for the Fourth Circuit stated that, "even if Patler could be said to have exhibited an actual expectation of privacy in the area searched, we cannot say that such an expectation is 'one that society is prepared to recognize as "reasonable".' " *Patler v. Slayton*, 503 F.2d 472, 478 (4th Cir. 1974). The court cited its own earlier decision in *United States v. Brown*, 487 F.2d 208 (4th Cir. 1973), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), in which it had held that a reasonable expectation of privacy could not be said to include the "open fields" area around a barn. In the *Brown* case, federal agents procured a search warrant for a still on the basis of odors which they had detected from positions outside the barn itself.

The opinion of the Court of Appeals in *Patler* and in *Brown* would seem to indicate that there can never be a recognizable expectation of privacy as to activities or things in the "open fields." This is respondent's position, and he bolsters it with the recent opinion of the United States Supreme Court in *Air Pollution Variance Bd. v. Western Alfalfa*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), in which the Court referred to the " 'open fields' exception to the Fourth Amendment approved in 'Hester.' "

Respondent's argument runs along these lines: In the *Hester* case the Su-

preme Court held that the protection of the fourth amendment did not extend to the "open fields." In the *Katz* opinion the court abolished the concept that there was no "search," as such, of a constitutionally protected area unless there had been physical penetration of that area which would constitute a "trespass" under state law. *Cf., Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); *Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942). The majority in *Katz* recognized that there were instances in which individuals expected to be private, such as when they were in a telephone booth with the door closed, and in which that expectation of privacy should be constitutionally protected, whether or not the government intrusion would constitute a common law trespass. *Katz* did not, however, speak to governmental observations or eavesdropping in the "open fields," because the "open fields" have always been excluded from protection. Therefore, the government may intrude with impunity in any manner onto any property, for any investigative purpose, so long as they remain outside the curtilage.

I do not believe that such a restrictive reading of *Katz* is warranted. In my opinion, the court in that case did abolish reliance upon common law property concepts which would include "open fields" and "curtilage," in search and seizure cases. I believe that the effect of the decision was to make the area in which the intrusion took place one of several factors to be considered in evaluating the reasonableness of an expectation of privacy as to activities carried on in that place; that *Hester* no longer has any independent meaning except insofar as it indicated that "open fields" were not areas in which one traditionally could have expected privacy, so that the court might view more strictly an assertion of privacy in an open area; but that the

final determination of the issue requires a close examination of all the facts. This approach was followed by the district court in *Patler v. Slayton, supra,*[1] and by the Court of Appeals in *Wattenburg v. United States, supra.*

The *Air Pollution* case does not defeat this argument because the facts of that case reveal that there could have been no reasonable expectation of privacy on the part of the defendant. Any reference to *Hester* was unnecessary to the decision. In that case, the facts were that a state air pollution field inspector entered defendant's yard to make an observation of the plumes of smoke being emitted from defendant's chimney; that the inspector saw the same plumes of smoke visible to anyone in the city who was near the plant; and that the test which he was making required him to stand at a distance equivalent to approximately two stack heights away from the chimneys under observation.

Examining the circumstances of the case now before the court, can it be said that petitioner had such an expectation of privacy as to his conversations and activities in the area outside his farm house that the observation and overhearing of such activities and conversation constituted a search? I believe so.

Petitioner established in state court that his property was fenced; that the law enforcement officers entered onto his property by climbing over a fence; that no express consent was given to the law enforcement officers to enter onto his property; that his property was wooded and hilly; and that he and his wife were the owners of the property, which was a 160 acre farm located in rural south-western Wisconsin. These facts were found by the state trial judge. In addition, there was undisputed testimony at the suppression hearing that the nearest public road was approximately six-tenths of a mile from the farm yard and that there was a No Tres-

---

1. Also see, *Dean v. Superior Court*, 35 Cal. App.3d 112, 110 Cal.Rptr. 585 (1973); *People v. Weisenberger*, 183 Colo. 353, 516 P.2d 1128 (Colo.1973).

passing sign posted on the property at the gate where the lane runs into the highway.[2]

In my opinion, these facts demonstrate that petitioner had a reasonable, exhibited, and justifiable expectation of privacy as to his activities and conversations not observable or audible beyond the boundaries of his own property. *Cf., Dean v. Superior Court*, 35 Cal.App.3d 112, 110 Cal.Rptr. 585 (1973), where petitioner had neither fenced nor posted the rural property on which he was raising marijuana and where he expressed no objection to the entry onto his land of law enforcement officers.

Reasonable expectations of privacy necessarily differ from one structure to another and from one setting to another. One who rents a motel room may be held to expect that his conversations might be audible to a person in an adjoining room and one who lives in a built-up city or suburban neighborhood must expect that his conversations in his home or in his yard may be audible to his neighbors or to passersby. In this case, however, there was nothing to indicate that petitioner and his wife should have had any reason to expect their conversations, even their shouted conversations, to be overheard by anyone. They had taken deliberate measures to ensure that their activities and conversations would be protected from other persons, official or non-official.

This is not a case in which the law enforcement officers observed and overheard petitioner and his wife from a public hallway or from a public sidewalk or roadway. The officers walked through an adjoining field and climbed over a boundary fence some distance from the road onto what they knew to be petitioner's private property. They knew it was petitioner's private property because they had made an initial search of the records in the office of the Register of Deeds to determine the ownership of the property onto which they intended to intrude. Their intrusion was neither inadvertent, *Cf., Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (See, generally, discussion in *Coolidge v. New Hampshire*, 403 U.S. 443, 464-471, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)) nor was it a "mere technical trespass," *Cf., United States v. Conner, supra*.

It is my opinion that the intrusion onto petitioner's land and the stationing of the law enforcement officers in the woods up on the hill to observe petitioner's reactions to a low-flying government plane constituted a search within the meaning of the fourth amendment; that having been made without a warrant and in the absence of any showing of exigent circumstances, the search was invalid; and that the fruits of the search, including the overheard conversation of petitioner and his wife as well as the marijuana, peyote, and other evidentiary items, should properly have been suppressed.

## RECOMMENDATION

It is respectfully recommended that:

1) the court find that petitioner has exhausted his available state court remedies within the meaning of 28 U.S.C. § 2254(b) and (c);

2) the court find as fact those matters set out herein under the heading, "Proposed Findings of Fact;"

3) the court adopt the "Proposed Conclusions of Law" set out herein; and

4) the writ of habeas corpus be issued.

Entered this 21st day of April, 1975.

S/Barbara B. Crabb

BARBARA B. CRABB
United States Magistrate

---

**2.** Respondent correctly points out that the No Trespassing Signs posted by petitioner failed to meet the statutory standard of Wis.Stats. § 943.13(2), which provides: "For land to be posted, a sign at least 11 inches square must be placed in at least 2 conspicuous places for every 40 acres to be protected." I consider, however, that the posting of the sign can support an inference that petitioner intended to keep his property private whether or not the posting which was done would support a state court action for trespass.