[No. 5739–9–III.   Division Three.   February 26, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL
A. CRANDALL, ET AL, *Appellants.*

*David Allen* and *Allen & Hansen, P.S.*, for appellants.

*John G. Wetle, Prosecuting Attorney,* for respondent.

THOMPSON, J.—Michael Crandall, Arthur Stoop, and Margaret Searle appeal convictions for manufacturing and possessing a controlled substance, marijuana.

On opening day of hunting season, October 9, 1982, a deer hunter reported to Tom Carlson, a property owner, discovery of what he believed to be growing marijuana. Carlson phoned the Stevens County sheriff's office. Deputy Ron Anderson was sent to the area and both Anderson and Carlson proceeded to follow the hunter's directions in search of the marijuana.

Mr. Carlson had begun construction of a barbed wire fence along the western boundary of his property. The parties, unable to see the marijuana from the property line, crossed under the 1–wire strand and walked approximately 20 to 50 feet onto the property of Arthur Stoop and Michael Crandall. At that point, Deputy Anderson looked through his rifle scope and confirmed the fact that he was viewing marijuana growing approximately 150 feet from their location.

Upon return to the Carlson residence, Deputy Anderson called his supervisor and was told to wait until Monday when a search warrant could be obtained. Later that evening Deputy Anderson, following a map sketched by Mr.

Carlson, returned to the marijuana patch which was approximately 200 feet from the eastern boundary, 800 feet south of the nearest residence or outbuilding, and 100 feet from the western boundary of the Crandall and Stoop property.

The deputy approached the patch from the west side, waited approximately 2 hours, and then, reaching across a barbed wire fence enclosing the garden, seized one plant and returned to the sheriff's department. A field test confirmed the plant was marijuana.

Deputy Anderson prepared an affidavit[1] and obtained a search warrant. On Monday, October 11, a search of the property yielded 235 marijuana plants—128 growing and 107 drying in a shed on the premises. Crandall, Stoop and Searle appeal their conviction based on the trial court's denial of their motion to suppress evidence gathered as the result of an allegedly unconstitutional search. We affirm.

U.S. Const. amend. 4 provides in part: "The right of the

---

[1]The affidavit states in pertinent part:

"On Oct. 9, 1982, I was contacted by a concerned citizen who wishes to remain anonymous and who meets the two prong test of reliability and trustworthiness. The citizen fears reprisal if identified but is willing to appear in camera if necessary.

"The citizen has been a resident of this area for a number of years, is active in community affairs and has no criminal record known to myself or the Sheriff's Dept.

"The citizen told me about what the citizen believed to be a large area of growing marijuana plants on property described as the West ½ of the N.E. ¼ of the S.E. ¼ of Section 28, Township 32, Range 38 E.W.M. in Stevens County West of the Addy Cedonia road, southwest of Schmidt meadows, who [sic] according to Assessor records, is owned by Arthur Stoop Sr. and Michael Crandall, 1391 W. Penn Cove Rd., Oak Harbor, WA.

"The citizen further told me that I could stand on Boise Cascade land adjacent and observe a number of the plants water barrells [sic] used to water them and black plastic pipe. The citizen further reported that the water came from a pump in the pond behind a cabin that the citizen believes belongs to the owners of the described property.

" . . .

"I went to where the citizen had directed me and observed a 3 to 4 strand bob wire fence in poor repair. Just across this fence was what I believed to be, growing marijuana plants from 3 ft. to 6 ft. in height and in the neighborhood of 60 to 80 plants."

people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . ." In order to be a "search" within the protection of the Fourth Amendment, the person invoking its protection must claim state invasion of a justifiable, reasonable, or a legitimate expectation of privacy. *Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979); *Katz v. United States,* 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). The inquiry requires answers to two questions: (1) whether the individual by conduct has exhibited a subjective expectation of privacy; and (2) whether society is prepared to recognize that expectation as reasonable. *State v. Young,* 28 Wn. App. 412, 416, 624 P.2d 725, *review denied,* 95 Wn.2d 1024 (1981) (citing *Smith v. Maryland,* 442 U.S. at 740).

■ However, Fourth Amendment protections do not extend to open fields and no legitimate privacy interest is recognized unless the area immediately surrounding the home is involved. *Oliver v. United States,* ___ U.S. ___, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984); *see also Betchart v. State Dep't of Fish & Game,* 158 Cal. App. 3d 1104, 205 Cal. Rptr. 135 (1984).

The term "open fields" includes:

any unoccupied or undeveloped area outside of the curtilage. An open field need be neither "open" nor a "field" as those terms are used in common speech. For example, . . . a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment.

*Oliver,* 104 S. Ct. at 1742 n.11.

The curtilage, the land and outbuildings immediately surrounding and associated with the home, is considered "part of the home itself for Fourth Amendment purposes." *Oliver,* 104 S. Ct. at 1742. "[E]xactly where the curtilage ends and the open field begins is answered only on a case to case basis, . . ." *State v. Wright,* 74 Wn.2d 355, 360 n.3, 444 P.2d 676 (1968), *cert. denied,* 394 U.S. 961 (1969). Under the facts in this case, we conclude the Fourth

Amendment protections are not available.

The Washington Constitution, Const. art. 1, § 7, differs significantly from the fourth amendment to the United States Constitution in providing: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Because of its unique language, Const. art. 1, § 7 generally provides greater protection than does the fourth amendment to the United States Constitution. *State v. Myrick*, 102 Wn.2d 506, 688 P.2d 151 (1984). If "'bona fide separate, adequate, and independent [state constitutional] grounds,'" are the foundation for a decision, it is unnecessary to reach federal constitutional issues. *State v. Coe*, 101 Wn.2d 364, 378, 679 P.2d 353 (1984) (quoting *Michigan v. Long*, ___ U.S. ___, 77 L. Ed. 2d 1201, 103 S. Ct. 3469, 3476 (1983)).

Furthermore,

> [w]hile we may turn to the [United States] Supreme Court's interpretation of the United States Constitution for guidance in establishing a hierarchy of values and principles under the Washington Constitution, we rely, in the final analysis, upon our own legal foundations in determining its scope and effect.

*Myrick*, at 510.

Therefore, though the specific language of the Fourth Amendment may not embrace open fields as stated in *Oliver, accord, United States v. Basile*, 569 F.2d 1053 (9th Cir. 1978), that does not foreclose an inquiry under the Washington Constitution to determine whether the State has unreasonably intruded into the defendant's "private affairs". The analysis is not confined to the subjective privacy expectations of citizens who are learning to expect diminished privacy, but rather, "it focuses on those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." *Myrick*, at 511.

Neither the open fields doctrine of *Oliver*, which looks to the nature of the property viewed, nor the reasonable expectations test of *Katz* are solely dispositive, but rather,

each serves as a factor in determining whether the entry onto the property unconstitutionally intruded into a person's "private affairs". *Myrick,* at 510–11.

 Here, the isolated instances of trespass by Deputy Anderson onto open fields which were not posted and were admittedly frequented by hunters do not offend the constitution. Any hunter might have observed the marijuana and directly notified the police in this instance. This property was not an area in which one traditionally could reasonably expect privacy, *United States v. DeBacker,* 493 F. Supp. 1078, 1081 (W.D. Mich. 1980) (citing *United States v. Freie,* 545 F.2d 1217 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 52 L. Ed. 2d 356, 97 S. Ct. 1645 (1977)), and therefore does not rise to a privacy interest held by the citizens of this state. *Myrick,* at 511. We conclude that in this case the search and seizure did not constitute an unreasonable governmental intrusion violative of the Washington Constitution.

Since we have held that the area where the search and seizure occurred was not constitutionally protected under either the fourth amendment to the United States Constitution or article 1, section 7 of the Constitution of the State of Washington, we need not address the validity of the search warrant and the supporting affidavit. However, review of the testimony of Mr. Carlson and Deputy Anderson himself makes it readily apparent false statements were included in the affidavit. We would be remiss were we not to observe the potential invalidity of the warrant had it been necessary to the case. *See State v. Stephens,* 37 Wn. App. 76, 678 P.2d 832 (1984).

The judgment is affirmed.

MITCHELL, J. Pro Tem., concurs.

McINTURFF, A.C.J. (dissenting)—I respectfully dissent. The majority opinion, although avowedly relying upon decisional precedents, actually invites a radical change of long–standing and fundamental Washington law. The

fourth amendment to the United States Constitution was proposed as a protection against the governmental intrusion on the privacy of its citizens. Its importance in the scheme of liberty contemplated by our founding forefathers is most evident in the context of its origins. In our nation's early years, government officials issued writs of assistance and general warrants to revenue officers, empowering them, in their discretion, to search places for smuggled goods. Notable vocal opposition arose to these abusive and warrantless writs claiming them "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book," insofar as they placed "the liberty of every man in the hands of every petty officer." 2 *The Works of John Adams* 523–24 (Chas. F. Adams ed. 1850); *see also* T. Taylor, *Two Studies in Constitutional Interpretation* 41 (1969).

In response to these writs and other intrusive governmental acts, the Fourth Amendment was drafted in 1787 with the intent to

> secure conditions favorable to the pursuit of happiness. [The drafters] recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans and their beliefs, their thoughts, their emotions and their sensations. *They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.*

(Italics mine.) *Olmstead v. United States,* 277 U.S. 438, 478, 72 L. Ed. 944, 48 S. Ct. 564, 66 A.L.R. 376 (1928) (Brandeis, J., dissenting).

After the revolution, several states enacted bills of rights in efforts to curb the discretion of searching officers. *See generally* 2 B. Poore, *Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the United States* (2d ed. 1877); N. Lasson, *The History and Development of the Fourth Amendment to the United States*

*Constitution* 13–14 (1937). Our state was one of those. An abundance of historical evidence and analysis reveals that the framers of the Washington Constitution intended Const. art. 1, § 7 to have a meaning different from the federal provision. The framers of the Washington Constitution considered a proposed state provision with language identical to the Fourth Amendment, but explicitly rejected it. Instead, the framers adopted our current version of Const. art. 1, § 7. *See Journal of the Washington State Constitutional Convention, 1889,* at 51, 497 (B. Rosenow ed. 1962). This provision "'is declaratory of the common law right of the citizen not to be subjected to search or seizure without warrant.'" *State v. Ringer,* 100 Wn.2d 686, 691, 674 P.2d 1240 (1983) (quoting *State v. McCollum,* 17 Wn.2d 85, 96, 136 P.2d 165 (1943) (Millard, J., dissenting)). *See also* T. Cooley, *The General Principles of Constitutional Law in the United States of America* 229–33 (A. McLaughlin 3d ed. 1898); F. Lieber, *Civil Liberty and Self Government* 59 (3d rev. ed. 1880). That common law right to be free from unwarranted searches or seizures encompasses the principles Lord Camden postulated over 200 years ago in *Entick v. Carrington,* 95 Eng. Rep. 807 (K.B. 1765), and summarized by the *Ringer* court:

> [E]very official interference with individual liberty and security is unlawful unless justified by some existing and specific statutory or common law rule; any search of private property will similarly be a trespass and illegal unless some recognised lawful authority for it can be produced; in general, coercion should only be brought to bear on individuals and their property at the instance of regular judicial officers acting in accordance with established and known rules of law, and not by executive officers acting at their discretion; and finally it is the law, whether common law or statute, and not a plea of public interest or an allegation of state necessity that will justify acts normally illegal.

*Ringer,* at 691 (quoting P. Polyviou, *Search and Seizure* 9 (1982)). In short, Const. art. 1, § 7 is:

a mandate that the right of privacy shall not be diminished by the judicial gloss of a selectively applied exclusionary remedy. In other words, the emphasis is on protecting personal rights rather than on curbing governmental actions.

*State v. White,* 97 Wn.2d 92, 110, 640 P.2d 1061 (1982). This underlying tenet of protecting individual rights has long been recognized as a paramount concern even in cases predating *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961). *See State v. Cyr,* 40 Wn.2d 840, 842, 246 P.2d 480 (1952); *State v. Miles,* 29 Wn.2d 921, 926, 190 P.2d 740 (1948); *State v. Gunkel,* 188 Wash. 528, 534–35, 63 P.2d 376 (1936); *State v. Buckley,* 145 Wash. 87, 258 P. 1030 (1927). With the intention of protecting personal rights, our Supreme Court has interpreted the Washington Constitution as being more protective of individual rights than parallel provisions of the United States Constitution. *See State v. Jackson,* 102 Wn.2d 432, 439, 688 P.2d 136 (1984); *State v. Chrisman,* 100 Wn.2d 814, 819, 676 P.2d 419 (1984); *Ringer,* at 690; *White,* at 108; *State v. Simpson,* 95 Wn.2d 170, 177–82, 622 P.2d 1199 (1980); *State v. Fain,* 94 Wn.2d 387, 392–93, 617 P.2d 720 (1980); *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 57, 615 P.2d 440 (1980); *Northend Cinema, Inc. v. Seattle,* 90 Wn.2d 709, 714, 585 P.2d 1153, 1 A.L.R.4th 1284 (1978), *cert. denied,* 441 U.S. 946 (1979); *State v. Hehman,* 90 Wn.2d 45, 49, 578 P.2d 527 (1978); *Darrin v. Gould,* 85 Wn.2d 859, 868, 540 P.2d 882 (1975). *See generally* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489 (1977).

On at least two recent occasions our Supreme Court has had the opportunity to interpret Const. art. 1, § 7 more expansively than the Fourth Amendment resulting in providing additional protection to citizens of this state. In *State v. Jackson, supra,* a plurality of the Supreme Court found that Const. art. 1, § 7 required application of the *Aguilar–Spinelli (Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *Aguilar v. Texas,* 378

U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964)) test for determining the existence of probable cause. This interpretation provided greater protections than those found by the United States Supreme Court. In *State v. Ringer, supra,* the court found the Washington Constitution to grant greater protections than the Fourth Amendment in the area of searches incident to an arrest. With the recognition that our constitution throws a larger protective blanket around the individual rights of our citizens, I next examine whether Mr. Crandall and the other parties had a reasonable expectation of privacy. To determine whether this state has unreasonably intruded upon the defendant's "private affairs" we consider several factors: (1) whether the individual by conduct has exhibited a subjective expectation of privacy, and these interests are those which citizens of this state have held, and "should be entitled to hold, safe from governmental trespass[2] absent a warrant"; (2) whether the individual's expectation of privacy is one that society is prepared to accept as reasonable; and (3) the nature of the property viewed. *State v. Myrick,* 102 Wn.2d 506, 510–13, 688 P.2d 151 (1984); *see also Oliver v. United States,* __ U.S. __, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984).

The common law property right to exclude others creates a legitimate expectation of privacy protected by our constitution. To assert their privacy interests, property owners need only take customary precautions reasonably calculated to alert the public. From *Hester v. United States,* 265 U.S. 57, 68 L. Ed. 898, 44 S. Ct. 445 (1924) through *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 56 L. Ed. 2d 305, 98 S. Ct. 1816 (1978), the United States Supreme Court, applying the less protective Fourth Amendment, has consistently explained

---

[2]I find it particularly interesting and significant the *Myrick* court used the term "trespass" rather than "intrusion" or other similar term. *State v. Myrick,* 102 Wn.2d 506, 511, 688 P.2d 151 (1984). As noted above, Const. art. 1, § 7 is declaratory of common law rights, and trespass at common law encompassed the "unauthorized entry upon the realty of another to the damage thereof." 2 *Bouvier's Law Dictionary* 3316 (3d rev. ed. 1914); *see also Zimmer v. Stephenson,* 66 Wn.2d 477, 483, 403 P.2d 343 (1965).

that the property right to exclude normally creates a legitimate expectation of privacy protected by the constitution, *see, e.g., Rakas v. Illinois,* 439 U.S. 128, 144 n.12, 58 L. Ed. 2d 387, 99 S. Ct. 421, *reh'g denied,* 439 U.S. 1122, 59 L. Ed. 2d 83, 99 S. Ct. 1035 (1978), although a technical trespass by the government will not violate the Fourth Amendment where the right to exclude has not been regularly asserted against the general public. *See, e.g., Air Pollution Variance Bd. v. Western Alfalfa Corp.,* 416 U.S. 861, 40 L. Ed. 2d 607, 94 S. Ct. 2114 (1974). As Justice Marshall, in his *Oliver* dissent, stated, "because 'property rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas, [they] should be considered in determining whether an individual's expectations of privacy are reasonable.'" *Oliver,* 80 L. Ed. 2d at 231 (citing *Rakas,* 439 U.S. at 153 (Powell J., concurring)). Indeed, Justice Rehnquist wrote for the Court in *Rakas,* "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [his] right to exclude." 439 U.S. at 144 n.12; *see also Oliver,* 80 L. Ed. 2d at 232 (Marshall, J., dissenting); and *Rawlings v. Kentucky,* 448 U.S. 98, 112, 65 L. Ed. 2d 633, 100 S. Ct. 2556 (1980) (Blackmun, J., concurring); *Marshall v. Barlow's, Inc., supra* at 312 (if the government intrudes upon a person's property, the privacy interest suffers). Justice Powell has observed, "property rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas, and therefore should be considered in determining whether an individual's expectations of privacy are reasonable." *Rakas,* 439 U.S. at 153 (Powell, J., concurring).

The common law has long recognized that one of the essential incidents of property ownership is the right to exclude others. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."); *Pruneyard Shopping*

*Ctr. v. Robins,* 447 U.S. 74, 82, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980); *International News Serv. v. Associated Press,* 248 U.S. 215, 246, 63 L. Ed. 211, 39 S. Ct. 68, 2 A.L.R. 293 (1918) (Holmes, J., dissenting) ("Property depends upon exclusion by law from interference"). The right of a property owner to exclude others creates a presumptively legitimate expectation of privacy.

Owners of land, especially in rural areas, may enjoy a reasonable expectation of privacy by virtue of the character of the property or by the mechanisms used to exclude the public. In *United States v. Holmes,* 521 F.2d 859 (5th Cir. 1975), the United States Court of Appeals for the Fifth Circuit was faced with a warrantless government search of a shed on the defendant's property. The court held that where the government agent had trespassed upon defendant's rural property and peered into a hole in the shed for *the sole purpose of securing evidence of a crime,* the agent's action was an unlawful search and seizure and did not fall within the open field exception to the warrant requirement. The landowner in *Holmes* did not post "no trespassing" signs nor did he attempt to exclude hunters. Yet the court found that a reasonable expectation of privacy had been exhibited simply because of the secluded character of the land searched. A dweller in a rural area, the court stated, whose property is surrounded by dense growth need not anticipate government agents crawling through the underbrush:

> The government would have us ignore the character of the Moody property. Whatever precautions a homeowner in an urban area might have to take to protect his activity from the senses of a casual passerby, a dweller in a rural area whose property is surrounded by extremely dense growth need not anticipate that government agents will be crawling through the underbrush by putting up signs warning the government to keep away.

521 F.2d at 870. In addition, the presence or absence of fences, gates and/or signs *manifesting an intent to exclude* has often indicated whether the persons claiming the pri-

vacy protection in an outdoor area failed to assert their legitimate expectations of privacy.

Justice Marshall indicated in his dissent, "[m]any of the uses to which (undeveloped land) may be put deserve privacy. And, by marking the boundaries of the land with warnings that the public should not intrude, the owner has dispelled any ambiguity as to his desires." *Oliver*, 80 L. Ed. 2d at 235. Justice Marshall also articulated the potentially tragic results of a policy disregarding the character of the property:

> [I]mportant practical considerations suggest that the police should not be empowered to invade land closed to the public. In many parts of the country, landowners feel entitled to use self–help in expelling trespassers from their posted property. There is thus a serious risk that police officers, making unannounced, warrantless searches of "open fields," will become involved in violent confrontations with irate landowners, with potentially tragic results.[3]

80 L. Ed. 2d at 235 n.19 (citing *McDonald v. United States*, 335 U.S. 451, 460–61, 93 L. Ed. 153, 69 S. Ct. 191 (1948) (Jackson, J., concurring)).

Indeed, in cases applying the less protective Fourth Amendment, many courts have determined that an owner's attempts to exclude the public indicate a legitimate expectation of privacy. *See United States v. Dunn*, 674 F.2d 1093, 1100 (5th Cir. 1982) (privacy expectation where fenced), *cert. granted and judgment vacated*, __ U.S. __, 81 L. Ed. 2d 340, 104 S. Ct. 2380 (1984); *United States v. FMC Corp.*, 428 F. Supp. 615, 618 (W.D.N.Y. 1977) (protected where fenced), *aff'd*, 572 F.2d 902 (2d Cir. 1978); *United States ex rel. Gedko v. Heer*, 406 F. Supp. 609 (W.D. Wis. 1975) (protected where posted and fenced), *vacated and dismissed without opinion sub nom. Gedko v.*

---

[3]Another serious danger is that if the police are permitted routinely to engage in such behavior, it will gradually become less offensive to us all which would thereby place the citizenry on a slippery slope of further governmental intrusion upon our privacy rights. *Oliver*, 80 L. Ed. 2d at 236 n.21 (citing *Olmstead v. United States*, 277 U.S. at 485 (Brandeis, J., dissenting)).

*Cady,* 588 F.2d 840 (7th Cir. 1978); *State v. Brady,* 406 So. 2d 1093 (Fla. 1981) (protected where posted and fenced), *cert. granted,* 456 U.S. 988 (1982), *cert. dismissed in part, judgment vacated in part,* ___ U.S. ___, 81 L. Ed. 2d 339, 104 S. Ct. 2380 (1984); *State v. Byers,* 359 So. 2d 84, 86 (La. 1978) (protected where posted and chain across road).[4]

In *State v. Byers, supra,* a hunter was on a tract of land owned by Mr. Williams. Though the property had not been fenced, it was posted with signs. These signs bore such announcements as: "private road; do not enter"; "posted no hunting, fishing, trespassing"; "posted no hunting." One of the defendants had also erected two posts set in concrete and connected with a chain in an effort to deny access to the general public. While on the property, the hunter saw a patch of plants under cultivation which he suspected was marijuana. He reported this observation to the police and later he and the chief of police and the deputy sheriff went on the property and looked at the plants. Both of these entries on the land were made without a search warrant and without the consent of the owner. The court held that where the growing of marijuana was not visible from a public road, posted signs announced that the logging road was private and prohibited entry of land and a chain barred access to the private road, defendants had a legitimate expectation of privacy with the result that the warrantless search and seizure by the police was unreasonable, requiring suppression of the seized marijuana.

Here, the marijuana was not visible from any area outside of the property boundaries. The very character of the property, located in rural Stevens County, makes it appar-

---

[4]*But see United States v. Lace,* 669 F.2d 46 (2d Cir. 1982) (search justified where land not posted and outsiders could enter at will), *cert. denied,* 459 U.S. 854, 74 L. Ed. 2d 106, 103 S. Ct. 121 (1982); *United States v. Miller,* 589 F.2d 1117, 1134 (1st Cir. 1978) (justified where "the appellant made no attempt to secure his open land from unwanted visitors"), *cert. denied,* 440 U.S. 958, 59 L. Ed. 2d 771, 99 S. Ct. 1499 (1979); *Patler v. Slayton,* 503 F.2d 472 (4th Cir. 1974) (justified where land beyond fenced); *United States v. Balsamo,* 468 F. Supp. 1363, 1379 (D. Me. 1979) (justified where "[t]here were no 'No Trespassing' signs or fences restricting access to the property").

ent that the landowner need not have anticipated unauthorized law enforcement safaris through the bush. Furthermore, the fence, which surrounded at least part of the property, announced that this property was private and prohibited entry of the land. Under these circumstances, the defendant landowners had a legitimate expectation of privacy.

The United States Supreme Court in *Johnson v. United States,* 333 U.S. 10, 92 L. Ed. 436, 68 S. Ct. 367 (1948) noted the Fourth Amendment prohibits police officers actively engaged in "the often competitive enterprise of ferreting out crime" from using unlimited discretion in search and seizure:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

333 U.S. at 13–14. Our Supreme Court's decision in *State v. Myrick, supra,* reaffirms that evidence obtained by a search and seizure made without a search warrant should be suppressed when no compelling reasons justify the failure to procure a search warrant. In *State v. Chrisman,* 100 Wn.2d 814, 822, 676 P.2d 419 (1984), the court also reasoned that the right of privacy was too precious to entrust to the discretion of police officers and that to justify a warrantless search, police officers must show some type of exigent circumstances.

Here, I would suppress the evidence because the record reveals that no compelling reasons or exigent circumstances existed to justify the failure to procure a search warrant, and therefore the sheriff's department unjustifiably circumvented the warrant requirement. The sheriff received a tip from a deer hunter indicating that marijuana would apparently be found on Mr. Crandall's property. After crossing a

fence and proceeding 20 to 50 feet onto the property, the deputy sheriff looked through his rifle scope and viewed marijuana growing approximately 150 feet from his location. Although Deputy Anderson's supervisor told him to wait until Monday, when a search warrant could be requested to search the property, the deputy nevertheless reentered the property, crossed a second barbed wire fence, and seized one of the plants. This conduct confounds a long list of cases which have stressed that, subject only to a few well established principles, "'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . ." *Thompson v. Louisiana,* __ U.S. __, 83 L. Ed. 2d 246, 250, 105 S. Ct. 409 (1984).

More is involved here than a marijuana plant. At stake is the fundamental right which has so long been the hallmark of our founding fathers: the right for one's person and property to be let alone, absent probable cause or exigent circumstances. That hallmark is no less imperative today.

Review denied by Supreme Court May 10, 1985.