[No. 42083-6-I.   Division One.   December 20, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. ERIC ROLF THORSON, *Appellant*.

*Lawrence Curt Delay*, for appellant.

*Randall K. Gaylord, Prosecuting Attorney*, and *Charles Z. Silverman, Deputy*; and *Philip J. Buri* of *Brett & Daugert, L.L.P.*, for respondent.

ELLINGTON, J. — Eric Rolf Thorson grows flowers and tends an orchard on a remote island in the San Juans.

When police officers came onto the island and served a warrant on another island resident, they searched through dense woods across that and another property, and onto Thorson's property. There, from the edge of a clearing, they observed a marijuana plant growing in a barrel. Thorson complains that their intrusion violated his right to privacy under article I, section 7 of the Washington Constitution, and that evidence seized as a result should have been suppressed. We agree, reverse, and dismiss.

## FACTS

In connection with a multi-agency drug investigation, a group of law enforcement officers executed search warrants at five properties located on Waldron Island in the San Juan Islands. Thorson's was not among these five properties. While searching one property, referred to as "the Gordon property," Officer Shearer of the Seattle Police Department traveled some distance through a heavily wooded area and came upon a clearing. He testified that he observed no boundary lines or markers during his search, and believed that he was at all times on the Gordon property until he reached the clearing. In fact, however, Officer Shearer's search took him off the Gordon property, across another parcel, and some way onto Thorson's property. When he reached the clearing, he realized he was no longer on Gordon's property. From the edge of the clearing, he observed a park-like area with an orchard, a pond, and several structures. He saw a single marijuana plant growing out of a large barrel next to a greenhouse. Officer Shearer returned to the Gordon property and informed Detective Asher of his sighting, and the two of them returned to the edge of the wooded area and viewed the plant again. They then returned to the Gordon property to finish executing their search warrant. At some point, Officer Shearer also took Detective Gover and a team of officers to the view site, but the plant was gone.

Eventually, Thorson's property was searched and nine marijuana plants were seized from Thorson's corn patch,

along with marijuana and other evidence. He was charged with manufacture and possession of marijuana. After a suppression hearing, the trial court found that when the officers observed the plant in the barrel, they were in a place they had a right to be, such that their observation of the plant was lawful under article I, section 7, under the "open view" doctrine. From that premise, the court made other rulings regarding Thorson's consent to the subsequent search and the validity of a later warrant, and admitted the evidence. After a bench trial, Thorson was found guilty of manufacturing a controlled substance and possession of over 40 grams of marijuana.

## DISCUSSION

In reviewing findings of fact entered following a motion to suppress, we review only those facts to which error has been assigned.[1] We will not disturb findings of the trial court that are supported by substantial evidence.[2]

Washington Constitution article I, section 7 provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Because article I, section 7 provides greater protections against warrantless searches and seizures than does the Fourth Amendment,[3] we begin with Thorson's claim under the state constitution.[4]

As a general rule, warrantless searches are per se

---

[1]*State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). The brief filed by Thorson's counsel contains no assignments of error to any of the trial court's findings of fact. This omission is cured, however, by Thorson's pro se brief, which properly assigns error to the trial court's findings.

[2]*Id.*; *State v. Chaussee*, 72 Wn. App. 704, 708, 866 P.2d 643 (1994).

[3]*State v. Ladson*, 138 Wn.2d 343, 348, 979 P.2d 833 (1999).

[4]*See State v. Johnson*, 75 Wn. App. 692, 698, 879 P.2d 984 (1994). We note that neither party has briefed *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). Rather, each party simply argued both Fourth Amendment and state constitutional issues here and below. Where controlling precedent establishes that the state constitutional protections are greater, *Gunwall* analysis is unnecessary. *Ladson*, 138 Wn.2d at 348.

unreasonable.[5] A few "jealously guarded exceptions" to the warrant requirement may justify a warrantless intrusion.[6] Exceptions fall into "several broad categories," including, as relevant here, plain view.[7] The burden is always on the State to prove one of these narrow exceptions.[8]

■ Under the test as stated in the seminal case, *State v. Myrick*,[9] the question under article I, section 7 is whether the government unreasonably intruded into the defendant's private affairs—an inquiry which "focuses on those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant."[10] *Myrick* does not, however, elaborate on how this test is to be applied. The *Myrick* court explicitly declined to rely upon either of the two traditional Fourth Amendment analyses, "protected places"[11] or the legitimacy of a defendant's subjective expectations of privacy.[12] But the *Myrick* court nevertheless gave cautious deference to these factors as a starting place in the article I, section 7 analysis,[13] and enumerated no other specific factors to

---

[5]*Ladson*, 138 Wn.2d at 349 (quotation marks and citations omitted).

[6]*Id.*

[7]*Id.* The "open view" doctrine is a variant of the plain view doctrine. An open view is not a true search because the observation takes place from a nonintrusive vantage point. A plain view situation is one in which the officer has justifiably intruded. *See State v. Seagull*, 95 Wn.2d 898, 901-02, 632 P.2d 44 (1981).

[8]*Ladson*, 138 Wn.2d at 350.

[9]102 Wn.2d 506, 688 P.2d 151 (1984).

[10]*Id.* at 511.

[11]"[T]he language of CONST. article 1, § 7 precludes a 'protected places' analysis and mandates protection of the person in his private affairs." *Id.* at 513 (citation omitted).

[12]*Myrick*, 102 Wn.2d at 513 (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)).

[13]The court stated:

[T]he question whether [a search] violates CONST. art. 1, § 7 is not answered by looking to the nature of the property viewed, alone. This is but one factor in determining whether the [search] has unconstitutionally intruded into a person's "private affairs."

consider. Thus, many subsequent cases have continued to discuss traditional Fourth Amendment concepts.[14]

■ *Myrick* requires us to look to the nature of the property, the expectation of privacy it reasonably supports, and the nature of the intrusion to answer the ultimate question: Whether the government's intrusion violated a privacy interest which citizens of this state have traditionally and justifiably held safe from governmental trespass absent a warrant.

## I. Nature of Property and Reasonable Expectation of Privacy

We begin by noting that while the Fourth Amendment offers no protection to "open fields,"[15] such is not the case under the Washington Constitution: "[O]ur state constitution does not foreclose a person's ability to protect his or her affairs in an 'open field.' "[16]

The usual way a property owner attempts to preserve privacy in rural areas is by way of fences and signs; the presence of such devices is generally of consequence in most discussions as to whether a government agent unreasonably intruded into a defendant's private affairs on rural property. Significant to the court in *State v. Johnson,*

---

We also reject the analysis which rests *solely* on the legitimacy of a defendant's subjective expectations of privacy.

*Myrick*, 102 Wn.2d at 513 (emphasis added).

[14]*See e.g., State v. Crandall*, 39 Wn. App. 849, 697 P.2d 250 (1985); *see also State v. Johnson*, 75 Wn. App. 692, 879 P.2d 984 (1994). For one point of view regarding problems interpreting *Myrick, see* Daniel J. Clark, *Dropping Anchor: Defining a Search in Compliance with Article I, Section 7 of the Washington State Constitution*, 21 SEATTLE U. L. REV. 1 (1997).

[15]*Oliver v. United States*, 466 U.S. 170, 180 n.11, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). (An "open field" is not necessarily either "open" or a "field"; rather, it refers to any unoccupied or undeveloped area outside the curtilage.)

[16]*Johnson*, 75 Wn. App. at 707 (citing *Myrick*, 102 Wn.2d at 510-11).

for example, was the presence of "no trespassing" signs and a fence with a closed gate across a driveway.[17]

In *State v. Hansen*,[18] a deputy sheriff responded to a fire call at the defendant's next door neighbor's house. As he drove by defendant's house, he saw four marijuana plants in a small garden adjacent to the road. Upholding a search and seizure under the state constitution, the court noted that the garden was neither posted nor fenced, and was clearly visible to neighbors and passersby. Thus, the court determined that the defendant had no legitimate expectation of privacy in the garden.[19]

In *State v. Crandall*,[20] an officer, acting without a warrant, trespassed on the defendants' fields and seized a marijuana plant. The fields were fenced by a single strand of barbed wire, but were not posted and were frequented by hunters. In fact, the warrantless search and seizure was initiated by a hunter's tip to the sheriff's office. The court, by a 2-1 majority, upheld the validity of the search and seizure under the state constitution. The court concluded that because of the characteristics of the field, any hunter could have observed the marijuana and notified the police. Thus, the court held that the property was not one in which a person could reasonably expect privacy.[21]

In both *Hansen* and *Crandall*, the critical factor is the likelihood of observation by strangers. In the one case, trespassers were to be expected, while in the other, no trespass was required to see the contraband, which was visible from the road. The presence or absence of fences and signs is, therefore, but one factor to consider in reviewing the reasonableness of the governmental intrusion, which must depend on the facts of each case.

Thorson's property lies on Waldron Island in the San

---

[17]*State v. Johnson*,75 Wn. App. 692, 707-08, 879 P.2d 984 (1994).

[18]42 Wn. App. 755, 714 P.2d 309 (1986).

[19]*Id.* at 763.

[20]39 Wn. App. 849, 697 P.2d 250 (1985).

[21]*Id.* at 854.

Juans. The island is rural and sparsely populated. It is not commercially developed, is not served by the state ferry system, has no public utilities, and has no amenities that would attract tourists. It is thus rarely visited by nonresidents, and strangers are neither welcome nor expected. The island is overwhelmingly agricultural and residential, and contains only those commercial establishments necessary to serve the needs of the relatively few year-round residents.

Privacy is carefully protected by the community, perhaps partly because, to a great extent, residents of the island conduct their daily domestic activities outdoors. Because of the intimate nature of outdoor living on the island, the residents do not approach one another's living areas without making some sound to announce their presence. The record shows that in addition to a structure labeled a "house," there are, scattered about Thorson's property, separate structures identified as a cook shack, kitchen area, bed shacks, bathtub, laundry, and privy, wherein Thorson conducts the corresponding daily activities. Most of these structures are in the clearing in the area in which the barrel was spotted. The officers described this area as "manicured," and "really well taken care of."

The surrounding area is heavily wooded, or, as the State described it, "thick forests." It is undisputed that Thorson's incriminating barrel was not visible from any road, from his driveway, or from the boundary between Thorson's property and that of any neighbor. The nature of Thorson's property is such that he has no reason to anticipate intrusion by strangers, much less by law enforcement officers. The location and topography support the conclusion that Thorson reasonably expected privacy, and that fences and signs were not necessary to assert that expectation.

## II. Nature of Intrusion

We next examine the nature of the intrusion. To reach

their vantage point, the officers had to trespass through a heavily wooded area across two other parcels and some distance onto Thorson's property. On only one of those parcels, the Gordon property, did they have a right to be present. Unlike the field in *Crandall*, Thorson's property was not frequented or traversed by uninvited persons. Although part of the island's trail system crossed Thorson's land, the unrebutted evidence is that the footpaths were used, by permission, only by other residents of the island, and are not for use as public ways.

The State argues, and the trial court agreed, that the absence of boundary markers excused the trespass, and that, as the court described it, the officers "went through the woods on the footpath and otherwise," thereby remaining in a place where they had a right to be. With these propositions we must disagree.

The traditional plain view doctrine applies in Washington.[22] An officer may observe what can be seen without a constitutional intrusion, that is, from a place where he has a right to be.[23] The warrant authorizing the search of Gordon's property did not authorize the officers to search beyond Gordon's borders. Since Thorson had a legitimate expectation of privacy in his woodlands, the legitimacy of the officers' presence depends upon whether the footpath is impliedly a public access way. If so, and if it took the officers to the point from which they made their observation, the officers arguably had a right to be where they were when they observed the plant in the barrel.[24] The record does not support either proposition. The evidence is that the island footpaths are not for public use, and are used only by island residents with permission of the property owner. Indeed, we can find no evidence that the footpath

---

[22]*See State v. Rose*, 128 Wn.2d 388, 400, 909 P.2d 280 (1996) (citing *State v. Young*, 123 Wn.2d 173, 182, 867 P.2d 593 (1994)).

[23]*See State v. Seagull*, 95 Wn.2d 898, 905, 632 P.2d 44 (1981); *State v. Dykstra*, 84 Wn. App. 186, 191 n.4, 926 P.2d 929 (1996).

[24]*See Seagull*, 95 Wn.2d at 902 (an officer has the same license to intrude as a "reasonably respectful citizen," but cannot exceed the scope of an implied invitation).

followed by the officers ever emerges on a public right of way. The State did not establish that the footpath is an impliedly open way.

In addition, we note that the record does not clearly support the court's implicit finding that the footpath followed by the officers continued to the edge of Thorson's clearing. The officer who made the initial observation did not so testify, nor did the others who followed. One officer testified, "We exited out of the woods in the brambles and were looking at a . . . botanical garden type parcel." Thorson testified there was a path to the edge of his clearing from the direction of the Gordon property, but that it entered his clearing at the edge of the orchard some 240 feet from the barrel at a different location from that described by the officers and at a point from which the barrel was not visible because of the orchard. Officer Shearer testified he first viewed the barrel 25 to 50 feet away from his position at the tree line. Detective Asher saw it with Officer Shearer, from 20 feet away. Their testimony is not consistent with the notion of a single viewpoint from a path at the edge of the tree line, looking into Thorson's clearing.

Even if the officers did see the barrel from a footpath that led to the edge of the clearing, however, the officers' presence on Thorson's property was unauthorized. The evidence in the record establishes that the footpath cannot be considered analogous to a driveway, ungated road, or sidewalk that is impliedly open to the public. Nor can Thorson's woods be analogized to fields frequented by hunters or other strangers. Instead, Officer Shearer made his discovery as part of his search for other "grow operations" on the Gordon property. He was still searching, but he was no longer on the Gordon property. He was not in a place where he had a right to be.

The absence of clear boundary markers does not change the analysis. Whether or not Officer Shearer knew his precise whereabouts, it is undisputed that the woods through which he came to the clearing belonged to Thorson, and as previously indicated, given the nature and loca-

tion of the property, Thorson had no reason to believe strangers would be present. It is not a matter of whether the officer made a mistake in good faith, but rather whether the officer had a lawful basis for his presence in the specific location from which he spied something incriminating. Were the rule otherwise, the officer's good faith belief in the basis for his intrusion would overwhelm the constitutional protection.

We find a measure of guidance in a Fifth Circuit case, decided under the Fourth Amendment. *United States v. Holmes*[25] is best known as the case disallowing a seizure based on information gained through the warrantless installation of an electronic tracking device on a motor vehicle. Another issue, however, involved the validity of a warrantless search of a shed located 20 feet from a residence. The house was located in a sparsely settled rural area. Immediately behind the house was a small yard. From there to the shed, the area was thick with trees. From behind the shed, the property extended to the edge of a river and was described as "heavily wooded, with dense undergrowth."[26] Government agents entered the property through the thick growth, approached the shed "under dense cover," and, admittedly looking for evidence of marijuana, peered into a large hole in the shed.[27] The agent smelled marijuana and saw burlap bags commonly used to pack it.

A divided Fifth Circuit agreed with the district judge that the shed was within the curtilage of the home and that the agent, in peering through the hole in the shed, trespassed on the curtilage. The court also agreed that the warrantless trespass was an unlawful search and seizure

---

[25] 521 F.2d 859 (5th Cir. 1975), *aff'd on reh'g by an equally divided court,* 537 F.2d 227 (5th Cir. 1976) (en banc).

[26] *Id.* at 862.

[27] *Id.*

which did not fall within the "open fields" exception to the warrant requirement.[28]

The court rejected the government's argument that the property owners had no reasonable expectation of privacy in the shed under the Fourth Amendment because no fences enclosed any part of the property, no "no trespassing" signs were posted, and there was no evidence of special attempts to conceal the marijuana from passersby. In language applicable with equal force to the present case, the Fifth Circuit stated:

> The government would have us ignore the character of the Moody property. Whatever precautions a homeowner in an urban area might have to take to protect his activity from the senses of a casual passerby, a dweller in a rural area whose property is surrounded by extremely dense growth need not anticipate that government agents will be crawling through the underbrush by putting up signs warning the government to keep away.[29]

Judge McInturff's dissenting opinion in *Crandall*[30] contains an interesting discussion of the *Holmes* case. Judge McInturff began with the proposition that for over a half century, the United States Supreme Court "consistently explained that the property right to exclude normally creates a legitimate expectation of privacy protected by the constitution."[31] Judge McInturff concluded that to assert this privacy interest, a property owner "need only take

[28]*Id.* at 869.

[29]*Id.* at 870. We note that *Holmes* has been rejected as Fourth Amendment precedent on this issue because of the court's divided opinions. *See United States v. Williams*, 581 F.2d 451, 454 (5th Cir. 1978).

[30]39 Wn. App. 849, 697 P.2d 250 (1985).

[31]*Id.* at 858-59 (McInturff, J., dissenting) (citing *Hester v. United States*, 265 U.S. 57, 68 L. Ed. 898, 44 S. Ct. 445 (1924); *Marshall v. Barlow's Inc.*, 436 U.S. 307, 56 L. Ed. 2d 305, 98 S. Ct. 1816 (1978)); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights.").

customary precautions reasonably calculated to alert the public."[32]

We return then to the test under article I, section 7: Is Thorson's privacy interest in avoiding the uninvited presence of law enforcement on his land an interest which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant?[33] We hold that it is. Only where there is some implied public access to private property does a police officer without a warrant have the right to intrude. To use Judge McInturff's words, the very character of Thorson's property located not only in a rural area, but on a rural island, "makes it apparent that [he] need not have anticipated unauthorized law enforcement safaris through the bush."[34] The officers' sojourn on Thorson's property for the sole purpose of looking for marijuana constituted an unreasonable intrusion into Thorson's private affairs. The search was therefore invalid under article I, section 7 of the Washington Constitution.

Because the marijuana and other evidence seized in Thorson's garden and home would not have been found but for the officers' initial observation of the marijuana plant growing in the barrel, the evidence must be suppressed under the derivative evidence doctrine.[35] Without such evidence, there is no evidence to support Thorson's conviction.[36] Accordingly, we reverse with direction to dismiss his conviction.

---

[32]*Crandall*, 39 Wn. App. at 858 (McInturff, J., dissenting).

[33]*See State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984).

[34]*Crandall*, 39 Wn. App. at 862-63 (McInturff, J., dissenting).

[35]*See State v. Chapin*, 75 Wn. App. 460, 463, 879 P.2d 300 (1994) (under the derivative evidence doctrine, "secondary evidence discovered by exploitation of the initial illegality will be suppressed unless it is sufficiently attenuated from the initial illegality to be purged of the original taint") (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).

[36]Our conclusion renders it unnecessary to reach the issue of whether the search and seizure was unconstitutional under the Fourth Amendment. We also do not reach the issues raised regarding the trial court's other rulings.

Reversed and dismissed.

KENNEDY, C.J., and WEBSTER, J., concur.

Review denied at 140 Wn.2d 1027 (2000).