IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84469-5-I |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| MERCEDES, MARY MARGARET, | |
| Respondent. | |

BOWMAN, J. — The State appeals the trial court's order suppressing evidence obtained from consensual warrantless searches of a fenced horse pasture belonging to Mary Mercedes. It argues the trial court erred by concluding that the Ferrier[1] rule applies to fenced pastures. Because the Ferrier rule applies to consent to search only homes, we reverse and remand for the trial court to consider whether Mercedes' consent was voluntary under the totality of the circumstances.

FACTS

The Mercedes property is a rural 2.89 acres in Stanwood. It has a long gravel driveway that leads to Mercedes' two-story single-family home. The property has "a large fenced area" for animals and "smaller pens near the house." The pens have gates that open to the larger fenced pasture. And some

---

[1] State v. Ferrier, 136 Wn.2d 103, 960 P.2d 927 (1998).

portion of the pasture is a steep "ravine area" not visible from the driveway.[2]

On January 4, 2018, Snohomish County Animal Services received a complaint that Mercedes had two "starved and neglected" horses on her property.[3] Snohomish County Animal Control Officer Angela Rench responded to the Mercedes property later that day to check on the condition of the animals. As Officer Rench drove down the driveway, she could see the two horses standing near the fence line in the larger fenced pasture. They were eating from small piles of hay. She also saw a water trough in the pasture. The only shelter was a "small tarp in the corner of the field."[4] The weather was wet, cold, and "snowy," but neither horse was blanketed. Their "shaggy" coats were dull with evidence of rain rot. From her vehicle, Officer Rench could "clearly see" the horses' spines, hip bones, and ribs sticking out even with their long winter coats. And they both had long, untrimmed hooves.

Mercedes came out of her house, and Officer Rench "explained the complaint." Mercedes said that she owned the horses. Mercedes told Officer Rench that the larger horse, a bay thoroughbred mare named Moria, was about 30 years old. And the smaller pony, a quarter horse mare named Buttons, was in her late 20s. From visual observation, Officer Rench concluded that Moria had a body condition scale (BCS) of 1.5 out of 9 and that Buttons had a BCS score of

---

[2] There is also a creek somewhere on the property. The record suggests the creek is near the ravine, but the precise layout of the property is unclear from the record.

[3] The complaint also reported several starved and neglected sheep and a near-death lamb. This case involves only the horses.

[4] The record does not describe which corner of the property this refers to. Mercedes told Officer Rench that her barn burnt down "about a month ago" and "all of her feed had been destroyed."

2.[5]  On the BCS scale for horses, 1 means the horse has "no fat covering over certain parts of its body," 5 means "a healthy horse, on average," and 9 is "a very obese horse."  Officer Rench explained to Mercedes that the horses were "in very bad shape."  She determined that based on the horses' BCS scores, they were emaciated, which was "a dire situation" because they "could potentially die."

Mercedes told Officer Rench that she fed the horses orchard grass hay once a day.  Officer Rench instructed Mercedes to increase the quantity and frequency she fed the horses and to include "senior grain, beet pulp, rice bran, and vegetable oil" with the orchard hay.  Officer Rench also suggested that Mercedes blanket the horses and put up a shelter for them.  Officer Rench instructed Mercedes to have a veterinarian out to examine Moria and Buttons by January 8, 2018.

The next day, January 5, 2018, Officer Rench returned to Mercedes' property.  From the driveway, she could see a vet examining Buttons and "floating," or smoothing down, her teeth.[6]  Officer Rench also saw that there were two new bales of hay on the property and that the horses had been fed.  Later that day, Officer Rench called the vet who examined the horses.  He told her that Moria had a BCS score of 1 and Buttons a 2, but "otherwise they seemed relatively healthy."  He said he gave Mercedes a "feed plan."

---

[5] Officer Rench testified that at some point, she felt the horses to determine their BCS.  She could not recall which visit that occurred, but she testified that she never left the area between the driveway and the fence during her initial assessment of the horses on January 4.

[6] The record does not show whether this examination took place in the fenced pasture. The trial court found that "common sense would indicate that the examination of horses would have taken place in a fenced off area not open to the public."

3

On January 9, 2018, Officer Rench visited Mercedes' property again. As she drove down the driveway, she saw Mercedes feeding the horses beet pulp. Officer Rench did not see any hay with the animals but saw a bale of orchard hay outside the pasture. There was still no shelter for the animals. Officer Rench parked her car in the driveway and walked to the fence line to speak with Mercedes. Mercedes said she had ordered blankets and the grain recommended by the vet. Mercedes also said she was following the vet's feed plan and feeding the horses several times a day.

On January 12, 2018, Officer Rench went to the property again after receiving another complaint about the horses' condition. As she drove down the driveway, she could see that the horses did not have hay. A man came out of the house and told her Mercedes was not home. Officer Rench left but asked the man to have Mercedes call her. Later that day, Mercedes called. Officer Rench told Mercedes that animal control received another complaint. "She became upset that more people had filed a complaint and she stated that she was just going to put the animals down." Officer Rench explained that was "her choice but she did not have to." Mercedes then told Officer Rench that she had just bought four bales of hay and received the blankets, which she planned to put on the horses. Mercedes also said that she was following the feed plan and "has always been feeding her animals."

On January 19, 2018, Officer Rench again visited Mercedes' property. As she drove in, "there was a gate that was closed" across "the top of the driveway." She stopped, and "Mercedes came walking up to the gate." They talked about

how the animals were doing. Officer Rench asked Mercedes if she could see the animals, and Mercedes agreed. Mercedes opened the gate and they walked down the driveway. From the driveway, Officer Rench could see that "the horses had been fed and were eating hay." She could also see a half-bale of hay and bags of grain and beet pulp. Officer Rench told Mercedes to continue following the vet's feed plan and to blanket the horses "when it's cold and wet."[7]

Over a month later on February 21, 2018, Officer Rench visited Mercedes' property. The gate at the top of the driveway was open, so she drove to the house. She could see the horses from the car, which "had improved only slightly in body condition." They still had no blankets or shelter and she saw no hay in the field or nearby. Officer Rench believed she could see a bag of grain or beet pulp. It appeared that no one was at the property, so she drove away, having never left the car.

On the morning of February 23, 2018, Snohomish County Animal Control Officer Rich Wiersma went to Mercedes' property. He drove down the driveway, and Mercedes was outside. He identified himself and told her he "was following up for Officer Rench to see if [Mercedes] had hay on [the] property for her horses." Officer Wiersma saw "there was no hay on the property and there was no evidence of any hay or feed having been fed out," and the water "was completely frozen." The horses were "still very emaciated" and "still [did] not have any blankets or access to shelter."

---

[7] Mercedes told Officer Rench that "the neighbors keep feeding her horses and [that] she thinks someone took the blankets off them because the blankets were found down by the creek."

5

Mercedes showed Officer Wiersma an unopened bag of alfalfa pellets. Mercedes told him she had bought two hay bales since Officer Rench's last visit but had run out the night before. She said she planned to get more that day. Officer Wiersma then asked to see receipts for the hay. Mercedes "went inside and came back out and said she didn't have receipts." Officer Wiersma asked where she got the hay from, and Mercedes said that she bought it from "Debbie Bell at Skagit Farmers." But when Officer Wiersma said he would call Skagit Farmers to confirm she bought their hay, Mercedes said her son sometimes picked up the hay and sometimes she bought hay from Tractor Supply in Arlington instead. Officer Wiersma reported his observations to Officer Rench.

Later that morning, Officer Rench called an employee of a horse farm next to Mercedes' property. The employee told Officer Rench that she had been feeding Mercedes' horses hay and grain through the fence because she was concerned about their condition. She said that she saw no hay or grain out for the horses, that they were emaciated, and that she was worried they would die if she did not feed them. She also said she "broke the ice in the creek" to ensure the horses had access to water.

That afternoon, Officer Rench applied for a search warrant to look for evidence of animal cruelty. The affidavit for probable cause detailed her and Officer Wiersma's observations from their visits. The court approved the search warrant, and animal control officers served it on Mercedes on February 24, 2018. They searched the property for evidence of food and water, and a veterinarian examined the horses. The examination showed that the horses were still

6

emaciated, so the officers seized them and took them to a boarding facility for feeding and care.

The State charged Mercedes with two counts of first degree cruelty to animals. Mercedes moved to suppress all the evidence gathered from Officer Rench and Officer Wiersma's visits to her property under CrR 3.6. She argued that the officers' actions violated the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution because the officers did not give her Ferrier warnings to explain that she could deny their requests for consent to search. Alternatively, Mercedes asked for a hearing under Franks.[8]

The trial court held a CrR 3.6 hearing on May 19, 2022. The court heard testimony from Officer Rench and Officer Wiersma. On July 29, 2022, the court entered findings of fact and conclusions of law. It concluded that despite Mercedes' consent, Officer Rench and Officer Wiersma unlawfully searched Mercedes' "privately owned fenced farmland" each time they entered Mercedes' pasture because they did not first give her Ferrier warnings.[9] The court redacted the search warrant to suppress any information the officers obtained while in the fenced pasture but allowed Officer Rench's observations from her car while in

[8] Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). At a Franks hearing, a defendant may challenge the truthfulness of factual statements made in an affidavit supporting a search warrant. State v. Atchley, 142 Wn. App. 147, 157, 173 P.3d 323 (2007).

[9] We note that the court found the officers' testimony "vague" as to the specific dates and times they crossed the fence line and entered the pasture to check on the horses, so it concluded that in those instances, it "must presume" the officers made their observations "while inside fenced private farmland."

7

Mercedes' driveway on February 21, 2018.[10]  The court also concluded that Officer Rench omitted a material fact from the search warrant affidavit because it stated that the veterinarian said the horses were "severely emaciated," but it did not state that the veterinarian also said they were "otherwise healthy."  The court added that fact to the affidavit.

The court concluded that the affidavit, as altered, did not show probable cause to support the search warrant.  It then excluded "all evidence gathered as a result of the previously authorized search."  On August 26, 2022, the court entered an order terminating the State's case, stating, "The court finds that the practical effect of the prior July 29, 2022, order is to terminate the State's case."

The State appeals.

ANALYSIS

The State argues that the trial court erred by holding that Ferrier warnings were required to obtain valid consent for the warrantless searches of Mercedes' fenced pastures.  Mercedes contends the trial court "correctly ruled animal control officers invaded [her] private affairs" in violation of her constitutional rights because "they entered part of her home to investigate potential crimes."  We agree with the State.

The State does not challenge the court's findings of fact, so they are verities on appeal.  State v. Freepons, 147 Wn. App. 689, 693, 197 P.3d 682 (2008).  We review conclusions of law in a suppression order de novo.  State v.

---

[10] The court also excluded all of Officer Rench's observations from the January 19, 2018 visit when the gate was closed at the top of the driveway because the closed gate was "a clear indication that anything beyond the gate is the property owner's 'private affairs.' "

8

Evans, 159 Wn.2d 402, 406, 150 P.3d 105 (2007); State v. Tagas, 121 Wn. App. 872, 876, 90 P.3d 1088 (2004).

Under article I, section 7 of the Washington Constitution, no person shall have their "home invaded, without authority of law."[11] The term "authority of law" generally refers to a valid warrant. State v. Cornwell, 190 Wn.2d 296, 301, 412 P.3d 1265 (2018). But police may search without a warrant under one of the " 'few jealously and carefully drawn exceptions to the warrant requirement.' " State v. Kinzy, 141 Wn.2d 373, 384, 5 P.3d 668 (2000) (quoting State v. Houser, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)). One such exception is consent. Freepons, 147 Wn. App. at 693 ("[a] warrantless search is constitutional when valid consent is granted").

The State bears the burden of proving that a warrantless search fits within one of the closely guarded exceptions to the warrant requirement. Kinzy, 141 Wn.2d at 384. Generally, to satisfy the consent exception to the warrant requirement, the State must show the "consent to search is voluntary, the consenting party has authority to consent, and the search does not exceed the scope of the consent." State v. Bowman, 198 Wn.2d 609, 618-19, 498 P.3d 478 (2021). But when officers conduct a "knock and talk"[12] without a warrant, before they can "enter the home," they must also inform the person from whom they

---

[11] Mercedes argued below that the officers also violated her Fourth Amendment rights. Article I, section 7 is "more protective of the home than is the Fourth Amendment." State v. Groom, 133 Wn.2d 679, 685, 947 P.2d 240 (1997).

[12] A "knock and talk" is an " 'inherently coercive' " situation when police officers come to a suspect's door without a warrant or other basis for entry, suspecting illegal activity but lacking probable cause to search, and ask for consent to enter and search the home. State v. Leupp, 96 Wn. App. 324, 333-34, 980 P.2d 765 (1999) (quoting Ferrier, 136 Wn.2d at 115).

seek consent that the person may lawfully refuse to consent to the search, may revoke consent at any time, and can limit the scope of consent to certain areas of their home.  State v. Ferrier, 136 Wn.2d 103, 118, 960 P.2d 927 (1998).

In Ferrier, an informant told officers about a possible cannabis grow operation at Ferrier's home.  136 Wn.2d at 106.  They went to the home with the intention to search it.  Id. at 106-07.  Since the officers thought they would not be able to obtain a search warrant without naming their informant, they conceived a plan to do a "knock and talk" in an effort to persuade Ferrier to allow them in the home without a warrant.  Id.

Four police officers appeared at Ferrier's home, armed and wearing uniforms and raid jackets with "police" written on them.  Ferrier, 136 Wn.2d at 107.  Two of the officers went to the front of the home, and two went to the back.  Id.  The officers in the front knocked on Ferrier's door, and she invited them inside her home.  Id.  They then radioed the two officers in the back, who joined them in a "15- by 15-foot room" with Ferrier and her two infant grandchildren.  Id. at 108.  Police told Ferrier they had information about a cannabis grow operation in her house, and they wanted to search her home and seize the cannabis.  Id.  Officers went over a " 'consent to search' form" with Ferrier, but neither the officers nor the form told her that she had the right to refuse to consent to a search.  Id.  Ferrier gave officers her consent to search her home.  Id.

Our Supreme Court concluded that the knock and talk, "as carried out here," violated Ferrier's article I, section 7 right to privacy in her home and invalidated her consent to the search.  Ferrier, 136 Wn.2d at 114-15.  It pointed

to the way the police conducted the "inherently coercive" procedure.  Id. at 115.

Significant to the court's analysis was the heightened constitutional protection

that a person's home receives, and "Ferrier was in her home when the police

initiated contact with her."  Id. at 118, 115.  The court was also concerned that

the police "conducted the knock and talk in order to avoid the necessity of

obtaining a search warrant authorizing a search of the home."  Id. at 115.  In light

of those concerns, the court held that "public policy supports adoption of a rule

that article I, section 7 is violated whenever the authoritie[ ]s fail to inform home

dwellers of their right to refuse consent to a warrantless search."  Id. at 118.

Still, our Supreme Court guards against extending the Ferrier rule outside

the use of a knock and talk procedure.  See State v. Khounvichai, 149 Wn.2d

557, 565-67, 69 P.3d 862 (2003) (Ferrier warnings are required only when police

seek entry into a home to conduct a consensual search for contraband or

evidence of a crime, not "merely to question or gain information from an

occupant"); State v. Williams, 142 Wn.2d 17, 27-28, 19-20, 11 P.3d 714 (2000)

(Ferrier warnings not required when police requested consent to enter a tenant's

home to arrest the tenant's visitor, who had a valid arrest warrant); State v.

Bustamante-Davila, 138 Wn.2d 964, 980-81, 983 P.2d 590 (1999) (Ferrier

warnings not required when police and an immigration agent gained consensual

entry into defendant's home to serve a presumptively valid deportation order).

And this court and Division Three have declined to extend the rule outside

the home.  See Tagas, 121 Wn. App. at 878 (police officer's failure to give Ferrier

warnings before searching the defendant's purse did not invalidate the

11

defendant's consent); State v. Witherrite, 184 Wn. App. 859, 864, 339 P.3d 992 (2014) ("The cited history of Ferrier and our court's treatment of the home as most deserving of heightened protection under our constitution leads us to conclude that Ferrier warnings need not be given prior to obtaining consent to search a vehicle.").  Instead, "[w]hen the state is not employing the knock and talk procedure, the court employs a totality of circumstances test to determine whether consent to search is valid."  Tagas, 121 Wn. App. at 878.

Mercedes argues that the trial court correctly applied the Ferrier rule because it determined her pasture was curtilage, a part of her home.[13] "Curtilage" is the area around a home " 'so intimately tied to the home itself' " that it is constitutionally protected as though it were the home.  State v. Ross, 141 Wn.2d 304, 312, 4 P.3d 130 (2000)[14] (quoting State v. Ridgway, 57 Wn. App. 915, 918, 790 P.2d 1263 (1990)).  The scope of curtilage is a question of fact, considering the " 'proximity, use and expectation of privacy' " in the property at issue.  Ridgway, 57 Wn. App. at 918 (quoting State v. Niedergang, 43 Wn. App. 656, 660, 719 P.2d 576 (1986)).

No published decisions expand the application of Ferrier to a home's curtilage.  Mercedes cites an unpublished decision in support of her argument. See State v. Witkowski, No. 53412-6-II (Wash. Ct. App. Apr. 6, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2053412-6-

---

[13] The State argues we need not engage in a Ferrier analysis because the police did not use a knock and talk procedure to gain access to Mercedes' pasture.  Because we conclude that the trial court erred by applying the Ferrier rule under these facts, we need not reach that issue.

[14] Internal quotation marks omitted.

II%20Unpublished%20Opinion.pdf. In that case, Division Two concluded that "Ferrier warnings were required prior to entry onto the curtilage of [a] property because the deputies' purpose was to search for evidence of a crime." Id. at 7-8.

Unpublished opinions are nonbinding authority. GR 14.1(a). In any event, we need not reach the issue because the record here does not support Mercedes' argument that the trial court determined her fenced pasture was curtilage. The trial court did not assess whether the proximity, use, and expectation of privacy in the pasture warranted the same protections as Mercedes' home. Indeed, several of the court's findings suggest the opposite. For example, in finding of fact 6, the court determined that when Officer Rench entered the fenced pasture on January 5, 2018, she was "no longer on any 'curtilage' of the property." Instead, the trial court relied on the unpublished case of State v. Thompson, No. 37375-4-III (Wash. Ct. App. Jan. 6, 2022), https://www.courts.wa.gov/opinions/pdf/373754_unp.pdf, to broadly conclude that the Ferrier rule "must apply to privately owned fenced farmland as is at issue in this case."

In Thompson, the defendant fled from officers on a snowmobile. No. 37375-4-III, slip op. at 2-3. Officers followed the snowmobile tracks and saw that they led through a chain link gate into the backyard of a nearby home and then disappeared under a blue tarp. Id. at 3. One officer contacted the homeowner while others waited outside near the backyard. Id. The officer obtained consent from the homeowner to enter her backyard and relayed that permission to the other officers, who went into the yard, moved the tarp off the snowmobile, and

felt that the engine was still warm. Id. at 3-4. The officers then gained consent from the homeowner to search the house and found the defendant standing in the living room. Id. at 4.

At a suppression hearing, the defendant argued that officers "entered the backyard before they had consent from [the homeowner] for a search, as reflected [by the time noted] in the [computer aided dispatch] report." Thompson, No. 37375-4-III, slip op. at 5. The trial court agreed that officers entered the backyard before the homeowner gave "informed consent" to search her home and yard. Id. at 5-6. So, it suppressed "the evidence gained as a result of the warrantless search of the home's backyard." Id. at 6. But the court rejected the defendant's argument that evidence gathered in the house was also tainted because " 'there was no causal connection between the initial search of the yard and the [subsequent] search of the house.' " Id. at 7.[15] After trial, the jury convicted the defendant of several crimes. Id. at 9. On appeal, the defendant challenged the court's ruling allowing evidence obtained from searching the home. Id. at 10.

Thompson is inapt here. Whether Ferrier warnings were required before searching the yard was not at issue in that appeal. Indeed, even if Division Two had concluded that Ferrier warnings were required before searching the fenced backyard of a home, it does not follow that the fenced pasture here enjoyed the same proximity, use, and expectation of privacy.

---

[15] Alteration in original.

Because the trial court erred by concluding that the <u>Ferrier</u> rule applied to Mercedes' consent to search her fenced pasture, we reverse and remand for the trial court to consider whether her consent to enter the pasture was voluntary under the totality of the circumstances.

_Brennan, J_

WE CONCUR:

_Hazelrigg, ACJ_

_____

*State v. Mercedes*, No. 84469-5-I

FELDMAN, J. (concurring in part/dissenting in part) — In *State v. Ferrier*, our Supreme Court announced a rule for "knock and talk" procedures employed by law enforcement officers when seeking a person's consent to search their home without a warrant. 136 Wn.2d 103, 106, 960 P.2d 927 (1998). Specifically, before a law enforcement officer can conduct a warrantless search of a home based on a resident's consent, the officer must inform the resident that they may lawfully refuse to consent to the search and may at any time revoke or limit the consent that they gave. *Id.* at 118. Recognizing the importance of such warnings, the court held that "[t]he failure to provide these warnings, prior to entering the home, vitiates any consent given thereafter." *Id.* at 118-19.

The Supreme Court has since "clarified that the *Ferrier* requirement is limited to situations where police request entry into a home for the purpose of obtaining consent to conduct a warrantless search . . . ." *State v. Khounvichai*, 149 Wn.2d 557, 563, 69 P.3d 862 (2003). While the majority opinion here is consistent with this stated limitation, there are compelling reasons to hold—as the trial court did below—that *Ferrier* warnings were required before Officers Rench and Weisma could enter Mercedes' gated pasture and examine her horses without a warrant or an applicable exception to the warrant requirement. Because *Ferrier* warnings were required but never given, I respectfully dissent.

The constitutional underpinnings of the Supreme Court's opinion in *Ferrier* clearly extend outside the home. The court in *Ferrier* recognized that its holding was not compelled by the Fourth Amendment to the United States Constitution.

136 Wn.2d at 109-10. Instead, the protection that the Court fashioned in *Ferrier* was mandated by the greater protection provided by article I, section 7 of our state's constitution. The court explained that "[t]his provision differs from the Fourth Amendment in that '[u]nlike the Fourth Amendment, Const. art. 1, § 7 clearly recognizes an individual's right to privacy with *no* express limitations.'" 136 Wn.2d at 110 (internal quotation marks omitted) (quoting *State v. Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994)).

Consistent with the Supreme Court's observation in *Ferrier* that article I, section 7 recognizes an individual's right to privacy with "no express limitations," here is what article I, section 7 says:

§ 7. Invasion of Private Affairs or Home Prohibited

No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

As the plain language of article I, section 7 shows, the protection it provides is not limited to the home; rather, it *also* applies, through the use of the disjunctive "or," to "private affairs. If *Ferrier* warnings are required to obtain valid consent before intruding into a suspect's home—as *Ferrier* squarely holds—then the same warnings are necessarily required before intruding into a suspect's private affairs—as occurred here. We cannot, and should not, ignore the constitutional protection of "private affairs."

It is equally clear, both factually and legally, that Officers Rench and Weisma intruded into Mercedes' "private affairs." In *State v. Thorson*, 98 Wn. App. 528, 533, 990 P.2d 446 (1999), this court recognized that "[t]he usual way a property owner attempts to preserve privacy in rural areas is by way of fences

and signs; the presence of such devices is generally of consequence in most discussions as to whether a government agent unreasonably intruded into a defendant's private affairs on rural property." The gated pasture here was on private property, and the trial court found that the horses "were always within a closed and fenced off area of the property, and never in any public area." Furthermore, while the upper gate to access the driveway was open when Officer Rench initially visited the property, Mercedes began locking the access gate prior to the January 19, 2018, visit and thereafter. These facts confirm that Officers Rench and Wiersma intruded into Mercedes' private affairs. No less than a home, these private affairs are entitled to protection from warrantless searches under article I, section 7 of our state's constitution.

Equally important, Washington courts have recognized and emphasized the importance of protecting unoccupied or undeveloped areas outside a suspect's home and curtilage. In *Thorson*, police officers observed marijuana plants growing in a clearing on Thorson's property. 98 Wn. App. at 530. Despite the absence of boundary lines or markers, the court held that the "officers' sojourn on Thorson's property for the sole purpose of looking for marijuana constituted an unreasonable intrusion into Thorson's private affairs. The search was therefore invalid under article 1, section 7 of the Washington Constitution." *Id.* at 540. The court also described "Thorson's privacy interest in avoiding the uninvited presence of law enforcement on his land" as "an interest which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." *Id.* In *State v. Johnson*, 75 Wn. App. 692, 708, 879

P.2d 984 (1994), the court described a similar intrusion onto a resident's open field as "not acceptable under our state constitution." Thus, while Officers Rench and Wiersma did not enter Mercedes' home or curtilage (a point on which I agree with the majority), they nonetheless intruded onto a portion of Mercedes' property that was entitled to protection under our state's constitution.

Additionally, the same concerns about coerced consent that animated the Supreme Court's holding in *Ferrier* are also applicable here. Emphasizing this concern in *State v. Budd*, 185 Wn.2d 566, 374 P.3d 137 (2016), the Supreme Court noted that "when confronted with a surprise show of government force and authority, most residents believe they have no choice but to consent to the search." *Id.* at 575. The court added that it was "not surprised by an officer's testimony that virtually everyone confronted by a knock and talk accedes to the request to permit a search of their home." *Id*. Here, Officers Rench and Wiersma confronted Mercedes on each visit wearing law enforcement uniforms, displaying firearms, and driving law enforcement vehicles. Similar to the circumstances in *Ferrier*, it is reasonable to conclude that, in the absence of *Ferrier* warnings, Mercedes would believe she had no choice but to consent to the search.

Also similar to the law enforcement officer in *Ferrier*, who wanted to search Ferrier's home for contraband, Officer Rench first visited Mercedes' property to investigate complaints from her neighbors that there were starved and neglected horses and sheep on her property. Officers Rench and Wiersma both testified below that they were involved in an "animal cruelty investigation,"

"investigating the possibility of animal cruelty," and other similar descriptions of investigative activity. During these visits, Officer Rench, and later Officer Wiersma, entered the gated pasture, manipulated the horses to determine their body conditioning score, and took photos of the animals and the property without a warrant (or an exception to the warrant requirement) authorizing them to do so. This is precisely the sort of investigative activity that, under *Ferrier*, can occur with a person's consent only after they are told that they may lawfully refuse to consent to the search and may at any time revoke or limit the consent that they gave.

In sum, article I, section 7 of our state's constitution requires that *Ferrier* warnings be given where, as here, a law enforcement officer intrudes into a suspect's home or private affairs without a warrant or applicable exception to the warrant requirement. Because *Ferrier* warnings were required but never given, I respectfully dissent.

Feldman, J.